Kenneth PROCTOR, Appellant

v.

Peter D. BUELL, as Administrator of the Estate of D.P. (Pat) Buell, Jr., Buell Group Partnership II LP, Raul Almazan, and Logan Enterprises, Inc., d/b/a Old Town Automotive, Appellees.

No. 05–08–01476–CV.

Court of Appeals of Texas, Dallas.

Aug. 17, 2009.

Kenneth L. Clark, Jr., Plano, TX, for appellant.

Jeffrey R. Seckel, McGuire, Craddock, Strother & Hale, Dallas, TX, for appellees.

Before Justices MORRIS, RICHTER, and LANG–MIERS.

## OPINION

Opinion By Justice LANG–MIERS.

This is an interlocutory appeal from the trial court's order denying appellant Kenneth Proctor's special appearance. We conclude that Proctor is not subject to personal jurisdiction. We reverse the trial court's order and render judgment dismissing Proctor from this cause for lack of personal jurisdiction.

### BACKGROUND

#### Plaintiffs' Allegations

The defendants include two entities: Adolphus Energy LP, and Adolphus Enterprises, Inc.; and five individuals: Jimmy Randall Sheppard, Donald W. Landrum, William W. Paty, III (Paty III), William W. Paty, Jr. (Paty Jr.), and Proctor (collectively, the Individual Defendants). Plaintiffs/appellees are Peter D. Buell, as administrator of the estate of D.P. (Pat) Buell,[1] Buell Group Partnership II LP (Buell Group), Raul Almazan, and Logan Enterprises d/b/a Old Town Automotive (Old Town).

Plaintiffs, who are Texas residents,[2] allege that the Individual Defendants illegally conspired with third-parties Shannon Johnson and Francois M. Chancy, "acting for themselves and/or on behalf of" third-parties YBC & Associates, LLC (YBC) "and/or American Gold Concentrate Corp." (collectively, the YBC Parties), "to defraud, among others, the Plaintiffs." More specifically, plaintiffs allege that the Individual Defendants solicited plaintiffs to invest "up to" $120,000 that was needed to acquire a 2,000–acre ranch in Hood County known as the Mitchell Ranch, which would include "at least 87% of the mineral rights of the property." Plaintiffs allege that the Individual Defendants further represented that Adolphus Energy was prepared to immediately begin drilling twelve horizontal wells, and that the drilling would be completed within two years. Plaintiffs allege that the Individual Defendants further represented that YBC agreed to "advance the necessary acquisition funds" to acquire the property and develop the wells if the Individual Defendants paid what YBC described as a "banking fee" that "would 'free up' over $10 million under YBC's control." Plaintiffs allege that the Individual Defendants guaranteed plaintiffs a 200% return on their investment within 60 days and represented and warranted that plaintiffs would receive a 2.5% overriding royalty interest in the Mitchell Ranch project. Plaintiffs allege that the Individual Defendants "and/or their representatives" agreed to execute a promissory note for the amount of plaintiffs' initial investment, and Paty III agreed to pledge as collateral a life insurance policy with a cash surrender value of $102,000. Plaintiffs allege that in response to the Individual Defendants' proposal, Pat Buell "and/or Buell Group" invested $60,000, and

---

1. Pat Buell was previously a plaintiff in this case. Five months after the case was filed, Peter D. Buell filed a suggestion of death under Texas Rule of Civil Procedure 151 informing the trial court that Pat Buell died and asking that the suit be permitted to proceed in Peter Buell's name on behalf of the estate of Pat Buell.

2. According to plaintiffs' third amended petition, which was the live petition at the time of the trial court's order denying Proctor's special appearance, Pat Buell was a resident of Dallas County, Buell Group is "a Texas domestic limited partnership," Almazan is a resident of Dallas County, and Old Town "is a Texas corporation."

"Almazan and/or Old Town" invested $30,000. Plaintiffs allege that "[a]fter an agreement had been reached, but while the documents were being prepared," Landrum contacted plaintiffs and told them that plaintiffs needed to send their money to YBC immediately "or the YBC funds would be lost." Plaintiffs allege that Landrum "represented and warranted that the Promissory Note, the Royalty Assignment, and Pledge Agreements would promptly be signed and sent to the Plaintiffs." Plaintiffs allege that after they wired $90,000 to YBC, the Individual Defendants "and/or their representative, refused to execute the Promissory Note, deliver the Royalty Assignment or to pledge the collateral." Alleging that the YBC Parties "never possessed any intent to advance any funds to the Defendants," and that the Individual Defendants "never intended to provide the Plaintiffs with an overriding royalty interest, return the Plaintiffs' investment, or pay any return on such investment," plaintiffs sued defendants for common-law fraud, violation of the Texas Deceptive Trade Practices—Consumer Protection Act, and violation of the "Texas Blue Skylaws."

### Proctor's Special Appearance

Proctor, a Washington resident, filed a verified special appearance objecting to the trial court's exercise of personal jurisdiction over him. Proctor's special appearance states that (1) he is a Washington resident; (2) he does not have and has not had continuous or systematic contacts with the State of Texas; (3) he never agreed to act as a partner with the other defendants, and (4) he does not know, has never had any communications with, and has never made any representations to, plaintiffs Pat Buell and Almazan. Proctor also states that in or about February 2006, Paty III asked Proctor for a loan and told Proctor that he would receive approximately 30% of the loan amount as interest. Proctor

also states that on or about February 24, 2006, he wired $50,000 from his accounts maintained in Seattle, Washington to an account in San Diego, California; and on or about May 5, 2006, $65,000 was wired back to his account in Seattle, Washington. Proctor also states that he is 83 years old, that he helps to care for his wife, and that both of them have "several medical conditions" that "might be adversely impacted" if he had to defend against a lawsuit in Texas.

### Plaintiffs' Response to Proctor's Special Appearance

In response to Proctor's special appearance, plaintiffs amended their petition and added the following allegations relating to the trial court's jurisdiction:

> Jurisdiction over the non-resident Defendants is proper inasmuch as all non-resident Defendants have engaged in business in the State of Texas. In this regard, Defendants Sheppard, Landrum, Paty III, Paty Jr., and Proctor formed a Texas general partnership for the purpose of holding and developing real estate in Texas. In particular, the Mitchell Ranch project which is the subject matter of the instant dispute is a property located within Northeast Hood County, Texas. All rights and interests which the Defendants acquired in connection with such project, regardless of where legal title resided, were for the benefit of the partnership formed by the [Individual] Defendants. Through their involvement with the Mitchell Ranch project, all [Individual] Defendants were engaged in business in Texas. Among other things, such Defendants sold certain rights in the Mitchell Ranch project and, pursuant to the partnership arrangement, shared in the profits for such sale. For instance, Proctor received $65,000 from the sale of such

property. Plaintiffs' claims against the Defendants arise out of the partnership operated by each of the [Individual] Defendants, and their attempt to develop the Mitchell Ranch project.

. . .

The partnership formed by the [Individual] Defendants, and/or their representatives, was created by operation of Texas law. The [Individual] Defendants, by and through various vehicles, acquired and held rights to . . . the "Mitchell Ranch" property. The [Individual] Defendants, and/or their representatives, formed the Texas partnership for the express purpose of developing both the surface and mineral interests of the Mitchell Ranch project. By virtue of their participation in the partnership, each of the Defendants was doing business in the State of Texas. Each of the Defendants held an equitable, if not legal, ownership in the Mitchell Ranch property. Defendants Sheppard, Paty III and Paty Jr. eventually sold their rights to the Mitchell Ranch property, and profited through such sale. By virtue of their ownership, operation, development activities, fund raising activities, and sale of the Mitchell Ranch property, the Defendants were generally doing business in the State of Texas. Moreover, inasmuch as the suit in question arises out of the Defendants' efforts in connection with the Mitchell Ranch property, each of the Defendants had specific contacts with the State of Texas.

Plaintiffs also filed a written response to Proctor's special appearance. In their response, plaintiffs argued that, "[b]y coming together for the purpose of owning, holding and developing Texas real estate," Sheppard, Paty Jr., Paty III, and Proctor formed a de facto partnership under Texas law. They also argued that "Proctor has not submitted any evidence refuting his involvement in the Texas partnership." They argued that Proctor was doing business in Texas "with respect to the transactions related to the real property interest by contributing money for the transaction, and receiving a portion of the profits from the sale of the Texas property interest." And they argued that "forming a Texas partnership for the purpose of owning, holding and developing Texas real estate constitutes sufficient minimum purposeful contacts with the State of Texas, so as to allow a Texas Court to address wrongs committed by the partnership."

**Undisputed Evidence Pertinent to Proctor's Special Appearance**

Proctor and plaintiffs also submitted evidence in support of their respective contentions about the trial court's jurisdiction over Proctor, including documents and excerpts from the depositions of Landrum, Sheppard, and Paty III. Although those excerpts are somewhat inconsistent concerning certain dollar amounts and other details, all three witnesses essentially describe the same series of material events.

The undisputed evidence demonstrates that Gary Humphreys told R.J. Sikes about a property in Texas known as the Mitchell Ranch. Sikes told Sheppard and the two of them decided to "basically try to get this acreage and try to package it in a format to get investors to invest in it." The first step was to buy a 90–day purchase option from Humphreys for $325,000, while they tried to find investors willing to fund the remainder of the purchase price. Money from Sheppard, Paty Jr., Paty III, and Proctor was used to buy the purchase option, which was signed on February 14, 2006 by Humphreys and his wife, as assignors, and Sikes, on behalf of assignee Texas Shepco, LP, a Texas limit-

ed partnership.[3]

To raise the additional money for the purchase price, Sikes and Sheppard contacted several potential investors, including Chancy and Johnson. Either Chancy or Johnson or both agreed to invest tens of millions of dollars in multiple potential "development projects," if Chancy first repaid Johnson's company, YBC, $200,000 in "banking fees" that Chancy had previously incurred.[4] Sheppard, Landrum, and Paty III worked together to raise the money needed for the banking fees. Sikes may have also been involved in those efforts. Landrum approached Pat Buell and Almazan. Sheppard, Landrum, and Paty III later had a telephone conversation with Pat Buell and his attorney about the banking fees.[5] Johnson later said he only need-

3. Sikes signed in his capacity as a member of Texas Shepco's general partner, RJ & JS, LLC.

4. Whether Chancy or Johnson or both would actually make the investment is unclear from the deposition testimony included in the record.

5. The evidence in our record also includes an unsigned letter from Pat Buell to Landrum dated March 16, 2006, which was apparently produced during discovery and states as follows:

> The purpose of this letter is to more clearly set forth the terms and conditions of the proposal which you have presented me with respect to causing to be advanced to you, or your designee, the sum of $115,000, to further a transaction whereby you, or one of your affiliates, will acquire approximately 2,000 acres in northeast Hood County, located just southwest of Granbury, Texas. The acquisition will include not only a fee simple interest in the property, but at least 87% of the mineral rights of the property (the "Mitchell Ranch"). It is the intention of Adolphus to immediately begin the drilling of twelve (12) horizontal wells on this particular property, and it is anticipated that the drilling and completion activities will take approximately 12 to 24 months. In order to acquire the Mitchell Ranch, you have retained the financial services of YBC & Associates, LLC ("YBC") and you have been advised by YBC that funds will be available to enable you to both acquire the property and undertake the development of the initial 12 wells.
>
> In order to insure that the above-referenced financing is available, you are required to pay certain "banking fees," which will enable your financial partner to make adequate financing available to you, and, at this point, you very much need the sum of $115,000 to insure that such financing is available. You are asking that Buell and/or its associates put up the $115,000 for which Adolphus will cause to be pledged to Buell and [sic] insurance policy having a cash surrender value of $102,000 (the "Insurance Policy"). Such Insurance Policy is more particularly described as the First Colony Life Insurance Policy number [omitted] in the face amount of $500,000, and which presently has a readily ascertainable cash surrender value of $102,000. The Insurance Policy is owned by a trust, the Trustee of which is William W. Paty, III. Mr. Paty has committed to pledge the cash value of the Insurance Policy, in order to secure the repayment of the above referenced $115,000, and has represented to Buell that he has the power and authority to do so.
>
> The purpose of this letter is to set forth the precise terms and conditions by which Buell will cause to be advanced to Adolphus, or its designee, the sum of $115,000, which terms and conditions are as follows:
>
> 1. Buell will cause to be loaned to Adolphus the sum of $115,000 to be represented by a demand promissory note bearing interest at the rate of fifteen percent (15%) per annum. The note shall be secured by a security interest in the above-referenced Insurance Policy and the personal guaranty of Donald W. Landrum ("Landrum").
>
> 2. Further, if requested, Landrum will pledge certain trucks and related farm equipment as additional collateral for the loan, and Landrum has represented to Buell that the unencumbered fair market value of said equipment approximates $60,000.
>
> 3. As further inducement to cause Buell to make the above-referenced loan, Adolphus will cause Buell or his designee to be assigned a 5% overriding royalty interest in

ed $140,000 to cover the banking fees. Paty Jr. contributed $50,000, Pat Buell contributed $60,000, and Almazan contributed $30,000 to cover the banking fees. In return, Chancy gave Pat Buell and Almazan "a letter in writing on his letterhead stating that he would pay them back 200 percent of their investment or whatever they invested by putting the monies up for the banking fees." In April 2006, Texas Shepco agreed to terminate its purchase option on the Mitchell Ranch in exchange for a payment of $638,222. Proctor received $65,000 of that payment. That payment was not used to repay Pat Buell and Almazan the money they loaned to pay the banking fees Chancy owed to YBC.

## PERSONAL JURISDICTION

■■■ The Texas long-arm statute permits Texas courts to exercise jurisdiction over nonresident defendants that do business in Texas. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041–.045 (Vernon 2008); *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 166 (Tex.2007). The broad language of the long-arm statute extends Texas courts' jurisdiction over nonresident defendants "as far as the federal constitutional requirements of due process will permit." *PHC–Minden*, 235 S.W.3d at 166. Personal jurisdiction over a nonresident defendant satisfies constitu-

tional due-process requirements when the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

■■■ The plaintiff bears the initial burden of pleading sufficient allegations to invoke the trial court's jurisdiction over a nonresident defendant under the Texas long-arm statute. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex.2007). The plaintiff can satisfy this initial burden by alleging that a nonresident defendant is doing business in Texas. *Assurances Générales Banque Nationale v. Dhalla*, 282 S.W.3d 688, 695 (Tex.App.-Dallas 2009, no pet.). If the plaintiff pleads sufficient allegations to satisfy its initial burden to invoke jurisdiction, the nonresident defendant then assumes the burden of negating all bases of jurisdiction alleged. *Moki Mac*, 221 S.W.3d at 574. To determine whether the plaintiff satisfied its pleading burden, and to determine the basis for jurisdiction alleged by the plaintiff, a court considers the allegations in the plaintiff's petition as well as its response to the defendant's special appearance. *Flanagan v. Royal Body Care, Inc.*,

each of the first 12 wells drilled on the Mitchell Ranch project. It is specifically understood that Buell is relying entirely upon the representations and warranties of Landrum as set forth above, and, except for *these representations and warranties*, Buell would not be willing to make the loan contemplated hereby.

4. It is further understood and agreed that should Buell be required to retain the services of legal counsel to collect the loan, or otherwise enforce the terms and provisions of this letter agreement, Buell shall be entitled to be reimbursed by Landrum all enforcement expenses, *including reasonable attorney's fees.*

5. Landrum will agree to sign an unconditional guaranty of repayment of the above referenced loan and all sums due thereunder and hereunder.

6. The parties agree to execute such other documentation, which in the reasonableness of Buell and his counsel, is necessary to adequately reflect the understanding of the parties generally described herein.

If the above terms and conditions are satisfactory to you and those by which you shall agree to be bound, please so designate in the appropriate space provided below.

232 S.W.3d 369, 374 (Tex.App.-Dallas 2007, pet. denied); *see also* Tex.R. Civ. P. 120a(3).

■ The ultimate question of whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Moki Mac,* 221 S.W.3d at 574. And because jurisdiction is a question of law, an appellate court reviews a trial court's determination of a special appearance de novo. *Id.* When a trial court does not issue findings of fact and conclusions of law in support of its ruling, as in this case, we imply in favor of the trial court's ruling all necessary fact findings that are supported by the evidence. *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337 (Tex.2009).

■ A nonresident defendant's contacts with a forum can give rise to either general or specific jurisdiction. *Id.* at 338. General jurisdiction arises when the defendant's contacts with the forum are continuous and systematic. *Id.* General jurisdiction has been described as "dispute blind" because it applies without regard to whether the nonresident defendant's contacts with the forum state relate to the plaintiff's cause of action. *See PHC–Minden,* 235 S.W.3d at 166 n. 5, 168. Specific jurisdiction, on the other hand, arises when (1) the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thereby invoking the benefits and protections of its laws,

and (2) the cause of action arises from or is related to those activities. *See Retamco Operating,* 278 S.W.3d at 338.

### ANALYSIS

### Plaintiffs' Jurisdictional Allegations Against Proctor

In this case, plaintiffs allege generally that Proctor was doing business in Texas.[6] But they do not allege that Proctor has had continuous and systematic contacts with Texas. Instead, they allege that Proctor is subject to jurisdiction in this case because (1) he was a partner in a de facto Texas partnership formed for the purpose of holding and developing real estate in Texas, which acquired and sold "an equitable, if not legal" interest in the Mitchell Ranch, (2) the Mitchell Ranch "is the subject matter of the instant dispute," and (3) plaintiffs' claims "arise out of the partnership operated by each of the [Individual] Defendants, and their attempt to develop the Mitchell Ranch." Based on these allegations, we conclude that plaintiffs contend that Proctor is subject to specific jurisdiction in this case. Consequently, Proctor bore the burden of proof to negate the exercise of specific jurisdiction. Bearing in mind that Proctor bore the burden of proof, we review the record to determine whether the pleadings and the evidence support the trial court's implied conclusion that Proctor is subject to specific jurisdiction.[7]

---

6. Because of plaintiffs' jurisdictional allegations, we reject Proctor's alternative argument that plaintiffs did not meet their pleading burden, and that Proctor conclusively negated any basis for jurisdiction by establishing that he is not a Texas resident. *See Dhalla,* 282 S.W.3d at 695 (plaintiff meets pleading burden by alleging nonresident defendant is doing business in Texas); *see also Retamco Operating,* 278 S.W.3d at 337–38 (even if plaintiff does not allege acts that constitute "doing business" under the long-

arm statute, because the statute reaches as far as constitutional requirements of due process will allow, court analyzes nonresident defendant's acts to determine whether those acts would bring nonresident defendant "within Texas'[s] jurisdiction consistent with constitutional due process requirements").

7. Proctor also argues on appeal that he is not subject to general jurisdiction. But because plaintiffs do not allege that Proctor is subject to general jurisdiction or that he had continu-

### Is Proctor subject to specific jurisdiction?

■ Plaintiffs argue that their claims against Proctor "arise out of" his contacts with Texas because (1) the Individual Defendants held an interest in the Mitchell Ranch, (2) the Mitchell Ranch "is the subject matter of the instant dispute," and (3) plaintiffs' claims "arise out of the partnership operated by each of the [Individual] Defendants, and their attempt to develop the Mitchell Ranch." In response, Proctor argues that "ownership of the Mitchell Ranch does not form the basis of [plaintiffs'] causes of action." Proctor also argues that because he conclusively demonstrated that he never had any contact with Pat Buell or Almazan, "there is no possible nexus between [Proctor] and [plaintiffs'] causes of action which are based on alleged representations, promises and warranties." We agree with Proctor.

In *Moki Mac,* the Texas Supreme Court explained that to support an exercise of specific jurisdiction, a nonresident's Texas contacts must be sufficiently related to the plaintiff's claims, which means there must be a "substantial connection" between the contacts and the operative facts of the claims, and the connection cannot be not "too attenuated to satisfy specific jurisdiction's due-process concerns." *Moki Mac,* 221 S.W.3d at 585, 588. And when the *Moki Mac* court applied that test to the facts in that case, it held that the contacts of the defendant Utah-based expedition company, which included representations concerning the safety of the trip that were made in the promotional materials it sent to people in Texas, were too attenuated from the operative facts of the plaintiffs' negligence claim arising from the death of their son during a rafting trip in Arizona, because the operative facts of the litigation principally concerned the alleged negligence of guides in Arizona. *See id.* at 572, 584–85.

Similarly, although Proctor contributed money that was used to acquire the purchase option on the Mitchell Ranch, and he profited from the sale of that purchase option, we conclude that his involvement with the acquisition and sale of the purchase option on the Mitchell Ranch is not substantially connected to, and is too attenuated from, plaintiffs' loan to pay the banking fees Chancy owed to YBC. The operative facts in the litigation concern principally the alleged misrepresentations made to Pat Buell and Almazan in connection with their loan to pay the banking fees Chancy owed to YBC, and it is undisputed that Proctor never communicated with Pat Buell or Almazan. As the *Moki Mac* court stated concerning the facts in that case, the communications with Pat Buell and Almazan in this case "will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question." Consequently, we conclude that Proctor does not have sufficient minimum contacts with Texas to support the trial court's exercise of specific jurisdiction over him because there is not a substantial connection between Proctor's contacts and the operative facts of the litigation. *See Moki Mac,* 221 S.W.3d at 585. As a result, we conclude that the trial court erred by denying Proctor's special appearance. And because we conclude that Proctor lacks sufficient minimum contacts, we do not need to determine whether the exercise of specific jurisdiction over Proctor would comport with

---

ous and systematic contacts with Texas, and because plaintiffs specifically allege instead that their claims against Proctor directly relate to Proctor's contacts with Texas, we as-

sume that the trial court's order denying Proctor's special appearance was not based on an implied conclusion that Proctor is subject to general jurisdiction in Texas.

traditional notions of fair play and substantial justice. TEX.R.APP. P. 47.1.

### CONCLUSION

We conclude that Proctor met his burden to negate plaintiffs' allegation that he is subject to specific jurisdiction. Consequently, we reverse the trial court's order and render judgment dismissing Proctor from this cause for lack of personal jurisdiction.