**Moris and Lillian TABACINIC,**
**Appellants**

v.

**Dr. William J. and Veronica**
**FRAZIER, Appellees.**

No. 05–11–00286–CV.

Court of Appeals of Texas,
Dallas.

April 19, 2012.

John K. Broussard, Jr., N. Terry Adams, Jr., Houston, TX, Sawnie A. McEntire, Dallas, TX, Beirne, Maynard & Parsons, L.L.P., for Appellant.

Joan R. Tarpley, Tarpley Dispute Resolutions, Robert H. Osburn, Billy R. McGill, Robert H. Osburn, P.C., Dallas, TX, for Appellee.

Before Justices MORRIS, RICHTER, and LANG–MIERS.

OPINION

Opinion by Justice RICHTER.

In this interlocutory appeal from the trial court's denial of their special appearance, appellants Moris and Lillian Tabacinic assert their contacts with the State of Texas are insufficient to support personal jurisdiction because all of the actions forming the basis of the lawsuit occurred in Florida and were undertaken in their corporate capacities. Because we conclude the Tabacinics' individual contacts with Texas are sufficient to support specific jurisdiction and the exercise of jurisdiction is consistent with traditional notions of fair play and substantial justice, we affirm the trial court's order.

## I. BACKGROUND

This case arises out of contract for the purchase of residential real property in Texas. William and Vernica Frazier, the Texas residents who purchased the property, sued Moris and Lillian Tabacinic and others in a Texas state court for fraudulent inducement, negligent misrepresentation, and breach of warranty. The Tabacinics filed a special appearance, asserting their contacts with Texas are insufficient to support the exercise of personal jurisdiction over them because they acted only in Florida in their corporate capacity. The Fraziers responded to the special appearance, and the trial court conducted an evidentiary hearing. Upon conclusion of the hearing, the trial court denied the special appearance. The trial court did not make any findings of fact or conclusions of law.

## II. DISCUSSION

In two issues, the Tabacinics assert the Fraziers did not meet their burden to plead or prove facts to satisfy the exercise of personal jurisdiction, and because the jurisdictional allegations are not supported by the record, any implied finding "fails on legal and/or factual sufficiency grounds." We will address these issues together.

### A. Applicable Law and Standard of Review

Texas courts may exercise personal jurisdiction over nonresident defendants in

accordance with the Texas long-arm statute. TEX. CIV. PRAC. & REM.CODE ANN. § 17.041–.045 (West 2008). The plaintiff bears the initial burden of pleading facts sufficient to bring the defendant within the reach of the Texas long-arm statute. *Id.; BMC Software, Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *Alliance Royalties, LLC v. Boothe,* 329 S.W.3d 117, 120 (Tex.App.-Dallas 2010, no pet.). Once the plaintiff meets his initial burden, the burden then shifts to the defendant to negate all bases for personal jurisdiction asserted by the plaintiff. *Id.* If the defendant does so, the burden shifts back to the plaintiff to show the court has personal jurisdiction over the defendant as a matter of law. *Id.*

 Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790–91 (Tex.2005). Because the trial court's exercise of personal jurisdiction over a nonresident defendant is one of law, an appellate court reviews the trial court's determination of a special appearance de novo. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *BMC Software,* 83 S.W.3d at 794. When a party challenges a trial court's ruling on a special appearance, and the court did not make findings of fact and conclusions of law, we infer all facts necessary to support the judgment if they are supported by the evidence. *Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 794–95.

 The Due Process Clause of the Fourteenth Amendment operates to limit the power of a state to assert personal jurisdiction over a nonresident defendant. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County,* 480 U.S. 102, 108, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404, (1984). The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Under the Due Process Clause, personal jurisdiction over a nonresident defendant is constitutional when the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174; *Int'l Shoe,* 326 U.S. at 320, 66 S.Ct. 154.

 Purposeful availment is the touchstone of the jurisdictional due process analysis. *Asahi,* 480 U.S. at 108–09, 107 S.Ct. 1026; *Capital Technology Information Services, Inc. v. Arias & Arias,* 270 S.W.3d 741, 750 (Tex.App.-Dallas 2008, pet. denied). A nonresident defendant's activities must be purposefully directed toward the forum state so that the nonresident defendant could foresee being haled into court there. *See Burger King,* 471 U.S. at 474, 105 S.Ct. 2174. There are three parts to a purposeful availment inquiry: (1) only the nonresident defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied on must be purposeful rather than random, fortuitous, or attenuated; and (3) the nonresident defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Michiana,* 168 S.W.3d at 785; *see also Moki Mac,* 221 S.W.3d at 575; *Capital Tech.,* 270 S.W.3d at 750.

"Jurisdiction is based on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Michiana,* 168 S.W.3d at 784.

 A defendant's contacts with a forum may give rise to either general or specific jurisdiction. Specific jurisdiction may exist over a nonresident defendant in a lawsuit that arises out of or is related to the nonresident defendant's contacts with the forum state. *Capital Tech.,* 270 S.W.3d at 749 (citing *Moki Mac,* 221 S.W.3d at 576). When specific jurisdiction is asserted, the minimum-contacts analysis focuses on the relationship between the nonresident defendant, the forum state, and the litigation. *Moki Mac,* 221 S.W.3d at 575–576. For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) the nonresident defendant's contacts with the forum state must be purposeful; and (2) the cause of action must arise from or relate to those contacts. *See Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174; *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559; *Moki Mac,* 221 S.W.3d at 576. In the present case, the Fraziers assert the Texas court has specific, rather than general jurisdiction over the Tabacinics. Our inquiry is limited accordingly.[1]

**B. Did the Fraziers Plead Sufficient Jurisdictional Facts?**

 First, we examine whether the Fraziers met their burden to plead sufficient jurisdictional facts to satisfy the long-arm statute. In doing so, we consider the original pleadings as well as the response to the special appearance. *See Proctor v. Buell,* 293 S.W.3d 924, 930 (Tex.App.-Dal-

las 2009, no pet.); *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 249 n. 7 (Tex.App.-Houston [1st Dist.] 2004, pet. denied).

The Fraziers' petition asserts the Tabacinics reside in Florida and engage in business in the state of Texas. The long-arm statute permits Texas courts to exercise jurisdiction over non-resident defendants that do business in Texas. *See BMC Software,* 83 S.W.3d at 795. The statute sets out a list of activities that constitute doing business in Texas. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (West 2008). Among other acts, a non-resident defendant does business in Texas if the non-resident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state, or commits a tort in whole or in part in this state. *See id.* According to the petition, the Tabacinics sold the Fraziers a new home (the "Home") that was not properly constructed in accordance with the parties' agreement. Although a partnership was the purported seller, the Fraziers were told the Tabacinics were really the sellers. Upon completion of the Home, numerous subcontractors were not paid and subsequently filed mechanics and materialmen's liens against the property. The petition asserts the Tabacinics and other defendants made negligent misrepresentations concerning the construction of the home and payment of subcontractors. In the alternative, the petition asserts the Fraziers were fraudulently induced to purchase the home. The petition further alleges the defendants breached express and implied warranties that the home was habitable, built in a good an workmanlike manner, fit for ordinary use, and fit for its particular purpose.

1. The Tabacinics also argue on appeal they are not subject to general jurisdiction. The Fraziers, however, do not allege the Tabacinics are subject to general jurisdiction or had continuous or systematic contacts with Texas, and expressly limited their argument to specific jurisdiction at the special appearance hearing and during oral argument on appeal.

In the Fraziers' response to the special appearance they assert: (1) the Tabacinics invested in multiple properties in Dallas, Texas through corporate entities they created for this express purpose; (2) the Tabacinics knew that their actions concerning the property in the instant case would have an effect on the Fraziers as Texas residents; (3) Tex Dynasty, LLC ("Tex Dynasty") was one of the entities the Tabacinics created for the purpose of managing the real estate they purchased in Dallas, Texas; (4) the Tabacinics also created 6418 Royalton, L.P. (the "Royalton Partnership"), and only the Tabacinics could authorize actions taken by the Royalton Partnership and Tex Dynasty; (5) the Tabacinics, through the Royalton Partnership, purchased the property at 6418 Royalton Drive (the "Royalton Property") as an investment property; (6) the Home was built on the Royalton Property; (7) the Tabacinics' niece, Sandy Tabacinic, was one of the builders of the Home; (8) Moris Tabacinic approved the transfer of funds from Tex Dynasty to the Royalton Partnership to fund the construction of the Home; (9) Moris Tabacinic stayed informed about the Royalton Property and approved or disapproved wire transfers relating to the construction of the Home; (10) Moris Tabacinic made all major and final decisions concerning the Royalton Property, including but not limited to how much money to invest in the Royalton Partnership; (11) the Home was still under construction when the Fraziers decided to purchase it, leaving the Fraziers the option to make certain decisions about construction and decor; (12) no major decisions concerning the Royalton Property were made without the approval of the Tabacinics; (13) the Tabacinics promised the Fraziers that certain tasks would be completed with regard to the Home, and signed a "punch list" agreeing to complete these items; (14) the items the Tabacinics

agreed to complete were not completed; (15) the Tabacinics were aware that the items had not been completed, but refused to fund the repairs; (16) the Tabacinics accepted $1.5 million from the Fraziers but failed to provide them with a completed home as agreed; (17) the Tabacinics made the conscious decision not to fund the completion of the Home and this undercapitalization and refusal of funding requests resulted in the Home having significant defects; and (18) the Tabacinics knew their actions would have an adverse impact on the Fraziers.

Based on the foregoing, we conclude the Fraziers satisfied their initial burden to plead a sufficient basis upon which to subject the Tabacinics to personal jurisdiction. To avoid litigating in Texas, it was then the Tabacinics burden to negate the bases for jurisdiction asserted by the Fraziers. After the special appearance hearing, the court determined the Tabacinics failed to do so. We now review that determination.

## C. Do the Facts Underlying The Contract Claims Support Jurisdiction?

■ The Tabacinics contend the documents relating to the purchase and sale of the Home were signed in a representative capacity on behalf of the Royalton Partnership and are therefore not germane to our consideration of individual jurisdiction. Thus, we must first resolve the threshold question as to the universe of contacts to be considered. The record reflects that the Tabacinics purchased the Royalton Property from Kinneret Custom Homes. Although the introductory paragraph of the purchase contract identifies Royalton Partnership as the buyer, Moris Tabacinic signed the signature line for buyer without indicating he was signing in a representative capacity. Likewise, the contract the Fraziers signed to purchase the property, which was made using a Texas Real Estate

Commission form, identifies the seller as the Royalton Partnership. The signature lines for the seller are signed by: Daniel Sragowicz ("Daniel") on behalf of the Royalton Partnership, and Moris and Lillian Tabacinic. Neither of the Tabacinics indicated they were signing in a representative capacity. Three addenda to the contract are similarly signed. Specifically, the "Addendum to New Home Contract" and the "Third Party Financing Condition Addendum" are signed by Daniel on behalf of the partnership, and Moris and Lillian Tabacinic individually. A third document, referred to as the "punch list," shows only the initials "DS," "MT," and "LT," with no reference to the partnership at all.

The Tabacinics testified they signed the foregoing documents in their corporate capacity on the lines designated for "seller," and argue that the contract defines "seller" as the Royalton Partnership. The general warranty deed for the property identifies the Royalton Partnership as the grantor. Dr. Frazier testified in his deposition that he understood the Royalton Partnership was the seller.

The record also reflects that on the same day the Tabacinics signed the sales contract for the Royalton Property, Moris Tabacinic signed two other corporate documents to form the Royalton Partnership. Both of these documents reflect that they were signed by Moris Tabacinic in his representative capacity for Tex Dynasty (the general partner of the Royalton Partnership).

■ It is well-established that a signatory is personally liable on an instrument that does not show he signed in a representative capacity. *See A. Duda & Sons, Inc. v. Madera,* 687 S.W.2d 83, 85 (Tex. App.-Houston [1st Dist.] 1985, no writ). Here, however, we are not charged with determination of the Tabacinics' liability on the contract, but whether the manner in which they signed the contract constitutes a sufficiently purposeful contact to justify the exercise of jurisdiction. *See Michiana,* 168 S.W.3d at 791–92 (stating special appearance involves consideration of only jurisdiction, not merits or liability); *Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829, 839 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) (same). The Fraziers argue that the manner in which the Tabacinics signed the documents forming the Royalton Partnership, as contrasted with the manner in which they signed the contract for the sale of the Royalton Property demonstrates their understanding of the distinction between an individual and representative signature. We agree. Despite his testimony that he signed the Royalton Property documents in a representative capacity, Moris Tabacinic admitted that unlike the documents forming the Royalton Partnership, the signatures on the Royalton Property contract and addenda include no such designation or notation.

■ The Tabacinics further assert that specific jurisdiction fails "when the only jurisdictional allegation is that the individual defendant signed a document in an individual capacity." We agree that a single contract with a Texas resident does not automatically establish jurisdiction. But a single contract may meet the purposeful availment standard where the agreement involves many contacts between the defendant and the forum over a period of time. *See Michiana,* 168 S.W.3d at 786–87. Thus, while a contract for an isolated sale in a state where the defendant does no business does not rise to the level of purposeful availment, other types of contracts, such as a franchise agreement, may establish minimum contacts. *See id; see also Rogers v. TexWest, L.L.C.,* 261 S.W.3d 818, 822 (Tex.App.-Dallas 2008, no pet.) (signing limited partnership agreement for creation of partnership to operate

in Texas). A contract for the purchase or assignment of Texas real property is such a contract. *See Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 339 (Tex.2008).

In *Retamco,* the Texas Supreme Court observed that, unlike the sale of a recreational vehicle in *Michiana,* the purchase of real property does not establish a single contact. *Id.* Instead, the purchase and ownership of real property could 'involve many contacts over a long period of time,' which would carry with it certain continuing obligations." *Id.* (citing *Michiana,* 168 S.W.3d at 787). Unlike personal property, real property will always be in Texas, "which leaves no doubt of the continuing relationship that this ownership creates." *Retamco,* 278 S.W.3d at 339.

The Tabacinics testified that they do not have a residence, maintain an agent, a place of business, or real or personal property in Texas, and have never paid taxes in Texas. The Tabacinics further testified they have been to Texas only twice for personal reasons. They have never met the Fraziers or communicated with them by telephone or correspondence.

Moris Tabacinic testified that he made the decision to invest in the Royalton Property. Tex Dynasty and Dynasty Investments ("DI") funded the purchase of the lot and construction. Moris Tabacinic approved the design and budget for the construction of the Home, and along with his wife, made all of the financial decisions concerning construction. He also approved six to twelve wire transfers from Tex Dynasty for the construction, and acknowledged that he knew his decisions would have an impact on the construction of the Home and the final product.

Daniel was an employee of the Royalton Partnership and reported to Moris Tabacinic concerning the construction of the Home. Daniel was charged with supervi-

sion of the construction and payments to subcontractors, and traveled to Texas several times for this purpose. When he did so, he reported back to Moris Tabacinic. During the construction of the Home, Daniel and Moris Tabacinic had discussions concerning the progress of the construction, including whether the work was completed on time and within the budget.

The punch list that the Tabacinics initialed and agreed to consisted of a number of items the Fraziers requested be completed in connection with the construction of the Home. The Fraziers testified they would not have purchased the Home but for the Tabacinics' representation that the punch list items would be completed. Moris Tabacinic testified that he had discussions with Daniel about the punch list and paying for the items on the list, and admitted that he and his wife made the decisions about whether to fund the items on the list.

There appears to be no dispute that the punch list items were not completed. Moris Tabacinic testified he was not aware the items had not been completed until the lawsuit was filed. Dr. Frazier testified that the items on the punch list were not completed, as well as numerous other construction items. In addition to the punch list, the contract for the purchase of the property provides for the substantial completion of improvements by the specified date. The contract further provides:

> Seller represents that as of the Closing Date there will be no liens, assessments, or security interests against the Property which will not be satisfied.

Dr. Frazier testified, however, that after closing, he discovered that many of the subcontractors who worked on the Home had not been paid and filed liens against the property in excess of $45,000. Neither the Tabacinics nor our review have identified any evidence to contravene the Frazi-

ers' allegations concerning these liens or the construction items that were not completed.

Given the arguments and proof, we conclude the manner in which the Tabacinics signed the contract, coupled with the nature of the contract itself, constitute sufficiently purposeful contacts to support the exercise of jurisdiction. Moris Tabacinic properly limited the capacity in which he signed the documents forming the Royalton Partnership by indicating he signed in a representative capacity. In contrast, the contract with the Fraziers contains no such designation. The signature line immediately above the Tabacinics' indicates that Daniel is the party signing the contract on behalf of the Royalton Partnership. By failing to indicate they signed in a representative capacity and initialing the punch list, the Tabacinics undertook a purposeful act that engendered a relationship between the Tabacinics, the Texas forum, and the subject matter of the pending litigation. Unlike a single contract for an isolated sale of a product to a Texas resident, the contract at issue here involves continuous contacts with Texas. These contacts are neither random nor fortuitous. The Tabacinics first purchased real property in Texas by signing a contract to be performed in Texas. Then, they sold the Texas real property by signing a contract with Texas residents that required development of the property in Texas. Through these purposeful actions, the Tabacinics invoked the benefits and protections of the laws of this state and created continuing obligations between themselves and residents of this state. Thus, the Tabacinics manifestly availed themselves of the privilege of conducting business in Texas.

### D. Do the Facts Underlying the Tort Claims Support Jurisdiction?

In addition to the claims sounding in contract, the Fraziers also assert the Tabacinics made negligent misrepresentations and fraudulently induced them to purchase the Home. Relying on the fiduciary shield doctrine, the Tabacinics insist they cannot be individually hailed into Texas because they acted exclusively in their corporate capacity. We disagree.

The fiduciary shield doctrine protects a nonresident corporate officer or employee from the exercise of jurisdiction when all of his contacts with Texas were made on behalf of his employer. *Nichols v. Tseng Hsiang Lin,* 282 S.W.3d 743, 750 (Tex.App.-Dallas 2009, no pet.). Courts that have applied the fiduciary shield doctrine, however, have limited its application to attempts to exercise *general* jurisdiction over a nonresident defendant. *Crithfield v. Boothe,* 343 S.W.3d 274, 287 (Tex.App.-Dallas 2011, no pet.); *Brown v. Gen. Brick Sales Co.,* 39 S.W.3d 291, 300 (Tex.App.-Fort Worth 2001, no pet.); *see also Garner v. Furmanite Australia Pty., Ltd.,* 966 S.W.2d 798, 803 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). A corporate officer or employee is not shielded from the exercise of *specific* jurisdiction as to torts for which the officer or employee may be held individually liable. *Tuscano v. Osterberg,* 82 S.W.3d 457, 467–68 (Tex.App.-El Paso 2002, no pet.); *see also Gen. Elec. v. Brown & Ross Int'l Distribs., Inc.,* 804 S.W.2d 527, 532–33 (Tex.App.-Houston [1st Dist.] 1990, writ denied). Corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation. *Shapolsky v. Brewton,* 56 S.W.3d 120, 133 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Thus, a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct

directed at the forum state for which he may be held personally liable. *See Ennis v. Loiseau,* 164 S.W.3d 698, 707 (Tex.App.-Austin 2005, no pet.). Because this specific jurisdiction case includes allegations sounding in tort for which the Tabacinics may be held individually liable, the fiduciary shield doctrine does not apply.

The Tabacinics' efforts to cloak themselves in the protection of the corporate veil similarly fail.[2] Citing *Wolf v. Summers–Wood, L.P.,* 214 S.W.3d 783, 793 (Tex.App.-Dallas 2007, no pet.), the Tabacinics assert they acted only in a corporate capacity and are not subject to personal jurisdiction because the Fraziers failed to pierce the corporate veil. We are not persuaded by this argument.

■ Jurisdiction over an individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual. *Davey v. Shaw,* 225 S.W.3d 843, 856 (Tex.App.-Dallas 2007, no pet.). Under an alter ego theory, personal jurisdiction may be established by imputing the jurisdictional contacts of one person to its alter ego. *BMC Software,* 83 S.W.3d at 798; *Ramirez v. Hariri,* 165 S.W.3d 912, 916 (Tex.App.-Dallas 2005, no pet.). To defeat the protection of the fiduciary shield doctrine, the plaintiff must show the individual was an alter ego of his employer. *Brown v. Gen. Brick Sales Co., Inc.,* 39 S.W.3d 291, 298 (Tex.App.-Fort Worth 2001, no pet.).

Here, it is undisputed that the alter ego claim asserted in the third amended petition was not before the court at the time the special appearance was heard.[3] Moreover, we have already concluded that the fiduciary shield doctrine is inapplicable in this specific jurisdiction case. Therefore, the Fraziers were not required to defeat the fiduciary shield doctrine by piercing the corporate veil to establish alter ego. In so concluding, we note that the Tabacinics' reliance on *Wolf* is misplaced. In *Wolf,* plaintiffs alleged the corporate entity was used as a sham to perpetrate a fraud, but offered no evidence in support of these allegations. *Id.* at 790. Significantly, there were no allegations of specific individual acts. *Id.* at 792. Instead, the *Wolf* plaintiffs relied on conclusory allegations that the individual defendants used the corporate form for "wrongful, fraudulent, and tortious acts personally committed by [the individuals]." As a result, the court concluded the pleadings failed to provide facts to support plaintiffs' allegations or meet plaintiffs' burden. *Id.*

■ In the present case, in addition to the fact that there was no alter ego claim before the court, the alleged fraudulent acts and omissions were not imputed to the Tabacinics; they were attributed to them individually. While individuals' contacts with a forum state are not to be analyzed based on their employer's activities in that forum, "their status as employees does not somehow insulate them from jurisdiction." *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). A corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the "guiding spirit behind the wrongful conduct" or the "central figure in the chal-

2. Although they fail to specify, the Tabacinics' corporate veil argument appears to be based on alter ego. Alter ego is one of several veil piercing theories. *See Service Corp. Intern., v. Guerra,* 348 S.W.3d 221, 228 n. 2 (Tex.2011).

3. The alter ago claim was asserted in the third amended petition two days before the special appearance hearing. Following the Tabacinics' objection, the Fraziers informed the court the hearing could proceed on the second amended petition and the court indicated it would so proceed.

lenged corporate activity." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir.1985).

The record reflects that the Royalton Partnership was formed for the purpose of acquiring the Royalton Property. The formation documents for the Royalton Partnership were signed on the same day as the contract for the sale of the Home. Tex Dynasty owns 0.05% of the Royalton Partnership and is its general partner. DI is the single limited partner of the Royalton Partnership and owns 99%. DI also owns Tex Dynasty. The Tabacinics are managers of Tex Dynasty, which Moris Tabacinic testified "could have" been formed to invest in Texas property. In addition to the Royalton Property, Tex Dynasty has invested in three other pieces of Texas real estate. Moris Tabacinic is also the president of Tex Dynasty. DI is owned by the MOTL trust, of which the Tabacinics are discretionary beneficiaries.

Moris Tabacinic testified that the only assets that the Royalton Partnership ever possessed were the Royalton Property and the cash funds infused into it by DI and Tex Dynasty. The Home sold to the Fraziers for $1.5 million. These proceeds were initially paid to the Royalton Partnership, and then subsequently transferred to DI and Tex Dynasty, leaving the Royalton Partnership with no assets. As a result, the Royalton Partnership no longer exists. Moris Tabacinic also testified that the funds DI received from the sale of the Home were used to make other investments. The decisions concerning the other investments were made by the Tabacinics.

On this evidence, we cannot conclude the Tabacinics' contacts with Texas did not include those made in their individual capacity. To the contrary, the evidence shows the Tabacinics had sufficient minimum contacts to support the exercise of specific jurisdiction over them individually, even if all of their activities in Texas were done in their capacity as an officer, manager or employee of the Royalton Partnership, Tex Dynasty, or DI. We also cannot conclude the Tabacinics' conduct was limited to Florida. The record reflects that the Tabacinics had a "substantial presence" in Texas.

■ The Tabacinics complain that jurisdiction may not be based on whether a defendant "directed a tort in Texas." We do not dispute that courts have been instructed to focus on "where the defendant's actions were carried out" and "the contacts themselves," as opposed to "whether the contacts were tortious." *Michiana*, 168 S.W.3d at 792. When examining tort allegations as a basis for specific jurisdiction, we must be careful to focus on the defendant's conduct and its relationship to the forum rather than where the plaintiff relies on the fraud. *See Michiana*, 168 S.W.3d at 790.

■ In the present case, the alleged torts, fraudulent inducement and negligent misrepresentation, are premised on the representations the Tabacinics made concerning the Home to be constructed in Texas. These alleged misrepresentations were purportedly contained in the contract and addenda the Tabacinics signed in their individual capacity. Although he contends he signed on behalf of the partnership, Moris Tabacinic acknowledged that initialing the punch list constituted a representation that the items listed on the punch list would be completed. There is no dispute that these actions were to occur in Texas. Because the representations underlying the tort claims concerned activity relating to Texas real property, sold to Texas residents, to occur in Texas, we conclude the Tabacinics purposefully directed their activities to the forum state and could rea-

sonably anticipate being haled into a Texas court to defend a lawsuit.

We further conclude the Tabacinics sought some benefit, advantage, or profit by availing themselves of the benefits and protections of Texas. *See Michiana,* 168 S.W.3d at 785. Despite the existence of the various entities the Tabacinics created to structure the transaction, the Tabacinics stood to reap financial benefits from the money obtained from the Texas residents through the alleged fraud. *See SITQ E.U., Inc. v. Reata Rest. Inc.,* 111 S.W.3d 638, 650–52 (Tex.App.-Fort Worth 2003, pet. denied). The proceeds and benefits from the sale of the Home were used to make other investments through entities the Tabacinics created and controlled. Both the decision to make other investments as well as the decision concerning the investments to be made were made by the Tabacinics.

On this record, the Tabacinics' contacts with Texas were sufficient to implicate the need for Texas to provide a forum for redress to its citizens. Accordingly, all three factors described in *Michiana* are resolved in favor of determining the Tabacinics' contacts constitute "purposeful availment" of the privilege of conducting activities in Texas. *See Michiana,* 168 S.W.3d at 785.

### E. Fair Play and Substantial Justice

The exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. We evaluate the contact in light of: (1) the defendant's burden; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the states' shared interest in furthering

fundamental substantive social policies. *Id.; TexVa, Inc. v. Boone,* 300 S.W.3d 879, 891 (Tex.App.-Dallas 2009, pet. denied). Only rarely will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident has purposefully established minimum contacts with the forum state. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 227 (Tex.1991).

Considering these factors in the context of this case, we first conclude the Tabacinics' burden and inconvenience in defending against the claims in the Texas litigation does not render jurisdiction over them in Texas unfair or unjust. There is nothing in the record showing that litigation in Texas would be unfair or unjust to the Tabacinics. Although there is some geographical distance between Texas and Florida, distance alone is not sufficient to defeat jurisdiction. *Guardian Royal,* 815 S.W.2d at 231. On the other hand, the Fraziers have a significant interest in seeking convenient and effective relief in the state in which they purchased the property at issue. Texas has a strong interest in adjudicating disputes concerning real property and contracts to be performed within its borders, and the efficiency of the interstate judicial system is best served by determining such suits in the state where the real property is located. Similarly, the states' shared interest in furthering fundamental substantive social policies strongly supports the notion that the forum state's jurisdiction over the Tabacinics is neither unfair nor unjust. To permit out of state residents to acquire and sell Texas property without subjecting themselves to specific jurisdiction as to lawsuits concerning that property would invite such residents to avail themselves of the privileges of conducting business in this state free from the corresponding obligations. The fundamental interest of state

courts in discouraging such activity, in conjunction with the other factors, supports the conclusion that the exercise of jurisdiction in this case comports with the notions of fair play and substantial justice. The Tabacinics' issues are overruled. The trial court's order denying the special appearance is affirmed.