**Opinion issued March 12, 2013**



**In The**

**Court of Appeals**

**For The**

**First District of Texas**

———————————

**NO. 01-12-00500-CV**

———————————

**WELLNESS WIRELESS, INC, Appellant**

**V.**

**NICHOLAS VITA AND ROSEMARY MAZANET, Appellees**

———————————————

**On Appeal from the 127th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-54116**

———————————————

**MEMORANDUM OPINION**

Wellness Wireless, Inc. filed this interlocutory appeal from the trial court's order granting the special appearances of nonresident defendants Nicholas Vita and Rosemary Mazanet. Wellness contends that the trial court erred in certain fact

findings and conclusions of law and that the trial court had personal jurisdiction over Vita and Mazanet. We affirm the trial court's order sustaining Vita's and Mazanet's special appearances and dismissing Wellness's claims against them.

## Background

Kimon Angelides founded Wellness as a Delaware corporation and registered it in Texas as a foreign for-profit corporation. Angelides initially served as the company's chief executive officer and director. Wellness's sole place of business was in a Houston office that Angelides had leased for the company. Wellness provided mobile health services to those with chronic diseases such as diabetes. The company was a "spin-off" subsidiary partially owned by Diabetes America, Inc., another Delaware corporation founded by Angelides that had patient health centers in Texas and Arizona. The two companies shared some common board members.

Vita, a resident of New York, and Mazanet, a resident of Connecticut, were principals in various affiliated entities collectively known as Argenis. Argenis owned stock in and made loans to Diabetes America. Argenis also owned shares in Wellness. At various times, Vita was a director of both Diabetes America and Wellness. Mazanet was periodically a director and officer of Diabetes America, but was never a director or officer of Wellness.

In or about April 2008, Diabetes America decided to settle civil claims against Healthpia, Inc. and Stephen Kim that were then pending in federal district court. Angelides, acting as Wellness's director, offered to assume Diabetes America's litigation expenses in that case in return for an assignment of all rights to any recovery from the lawsuit. Wellness and Diabetes America executed an assignment agreement to that effect in May.

On the same day that the assignment agreement was executed, Diabetes America entered into a settlement agreement with InfoPia America LLC, a Florida company affiliated with Healthpia, to resolve the civil claims. Under that agreement, InfoPia agreed to pay Diabetes America a total of $800,000 according to a payment schedule.

In October 2008, Angelides resigned as director and CEO of Wellness, at which point Wellness ceased operations. Vita formally resigned as a director the following month. Wellness's status as a registered foreign for-profit corporation in Texas was forfeited in May 2009, and its status as a Delaware corporation was forfeited the following October.

Pursuant to the settlement agreement with Diabetes America, Infopia made an initial payment of $300,000 which was in turn paid to Diabetes America's law firm. Infopia failed to make any further payments as required under the settlement

agreement. Diabetes America obtained a default judgment against Healthpia and Stephen Kim in December 2008.

In early 2010, a telephonic meeting took place among three Diabetes America board directors: Vita, Mazanet, and Bonita Groesser. The purpose of the meeting was to discuss and approve a new settlement agreement with Infopia. Mazanet and Vita participated in the meeting from outside Texas. The record does not reflect from where Groesser, a Texas resident, participated in the meeting. In February 2010, Vita signed in New York on behalf of Diabetes America a "Settlement Agreement and Mutual Release" with Infopia whereby the parties released claims against one another for payment by Infopia of $300,000. The 2010 Settlement Agreement and Mutual Release does not refer to any assignment right held by Wellness.

After having resigned from his positions at Diabetes America and Wellness in 2008, Angelides pursued other business activities. Starting in 2011, Angelides obtained consents from various Wellness shareholders (except Argenis) to be appointed as acting director to collect outstanding debts and wind up the company. At the time, Wellness's corporate status remained forfeited. Angelides engaged counsel for Wellness to demand from Infopia the payments due under the 2008 settlement agreement. Infopia refused on the ground that the debt was satisfied and

referred to the 2010 Settlement Agreement and Mutual Release that it had executed with Diabetes America.

Wellness sued Vita and Mazanet (as well as Groesser) for "converting" the recovery that had been assigned to it. It asserted claims for fraud, gross negligence, misappropriation of confidential information, usurpation of corporate opportunity, breach of fiduciary duty, and civil conspiracy. Wellness further claimed that Vita's and Mazanet's actions benefitted not only Argenis, but also Vita and Mazanet individually because they were Argenis's principals. As stated by Wellness in its proposed findings of fact and conclusions of law, all of Wellness's claims "relate to" the approval and signing of the 2010 Settlement Agreement and Mutual Release. After Wellness filed suit, the Texas Secretary of State issued Wellness a certificate of conversion certifying its status as a Texas corporation, and Wellness was later reinstated as a Delaware corporation.

Vita and Mazanet filed a special appearance with supporting affidavits to challenge the district court's exercise of personal jurisdiction over them, contending that they were residents of New York and Connecticut, respectively. The district court conducted a hearing on the special appearance on Friday, February 10, 2012. None of the parties called any witnesses at the hearing. During the hearing, the trial court suggested that Wellness's counsel "tighten up" the

petition and gave Wellness "two weeks from today to fix" the pleading. It also requested additional briefing on issues relating to the special appearances.

On Monday, February 12, the trial court coordinator informed the parties by email that the judge "will not require the briefing he asked for" because he "is going to grant the Special Appearance." Later that day, Wellness filed a new pleading (the "Fifth Supplemental Petition") and a supplemental brief discussing "new reasons, not raised previously, on why" the special appearances should be denied. The next day, it also filed "supplemental comments" along with Angelides's supporting affidavit. Wellness did not request leave to file the supplemental petition, brief, "comments," or evidence.

Over two months later, the court signed an order holding that it lacked personal jurisdiction over Vita and Mazanet. The same order reflected the court's findings of facts and conclusions of law on the special appearance ruling. Wellness requested amended findings and conclusions, effectively asking the court to reverse its decision. The district court denied the motion. Wellness timely filed this interlocutory appeal.

**Personal Jurisdiction**

Wellness argues that it pleaded sufficient jurisdictional facts to bring Vita and Mazanet within the Texas long-arm statute and that it proved sufficient minimum contacts to establish the Texas courts' personal jurisdiction over them.

6

Vita and Mazanet disagree and contend that Wellness has not demonstrated any acts by them directed at the State of Texas that are sufficient to establish Vita's and Mazanet's purposeful availment "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958).

## A.     Standard of Review

"Whether a court has personal jurisdiction over a nonresident defendant is a question of law, which we review de novo." *Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). "Existence of personal jurisdiction is a question of law, but that determination must sometimes be preceded by the resolution of underlying facts." *Int'l Elevator Co. v. Garcia*, 76 S.W.3d 778, 781 (Tex. App.—Houston [1st Dist.] 2002, no pet.). When, as here, the trial court makes findings of fact and conclusions of law in support of its ruling, the appellant may challenge the legal and factual sufficiency of the evidence to support those findings. *BMC Software*, 83 S.W.3d at 794.[1] A factual finding will be reversed for

---

[1]     We note that in *Moncrief Oil International, Inc. v. OAO Gazprom*, 332 S.W.3d 1 (Tex. App.—Fort Worth 2010, pet. granted), the Fort Worth Court of Appeals considered a special appearance that was, like the special appearances in this case, "nonevidentiary in the sense that no witnesses testified and no evidence was introduced at the hearing." 332 S.W.3d at 7. The court considered itself to be "in the same position as the trial court" and thus "implying all facts supported by the evidence in favor of the trial

legal insufficiency only if there is no evidence to support the finding. *Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 836 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). A factual finding will be reversed for factual insufficiency only if it is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.*

"If findings of fact are not challenged, they are binding on the parties and on this Court." *In re K.R.P.*, 80 S.W.3d 669, 673 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *see also Botter v. Am. Dental Ass'n*, 124 S.W.3d 856, 860 n.1 (Tex. App.—Austin 2003, no pet.) ("When a court issues findings of fact we are to assume that they are valid unless they are challenged by the appellant[.]").

We do not review the trial court's conclusions of law for factual insufficiency; we instead review the trial court's legal conclusions drawn from the

court's ruling seem[ed] inappropriate." *Id.* (citing *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 726–27 (Tex. App.—Corpus Christi 2006, pet. denied)). The issue is "why the trial court's findings should be given any special deference in circumstances such as these." *Villagomez*, 210 S.W.3d at 727. The Texas Supreme Court has granted a petition of review in *Moncrief*, but as of the date of this opinion, the Supreme Court has not yet issued a decision in the case. Therefore, we continue to apply the standard thus far endorsed by the Supreme Court: "the proper standard of review require[s] the appellate court to imply all fact findings supported by the evidence in favor of the trial court's ruling." *Moncrief*, 332 S.W.3d at 8 n.6 (citing *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010), and *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). Nonetheless, even if we were to apply a de novo standard to the trial court's findings, we would rule the same way because the record in this case presents no jurisdictional fact disputes that we would need to resolve.

facts de novo to determine their correctness. *BMC Software*, 83 S.W.3d at 793–94. If a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal. *Id.*

In its first issue, Wellness contends that the trial court erred in seven of its eleven factual findings because they are "against the weight of the evidence." We construe this issue as a factual sufficiency challenge to the identified factual findings. In its second issue, Wellness contends that the trial court erred in six of its fifteen conclusions of law because they reflect "an incorrect understanding and application of the law." Being challenges to conclusions of law, we review them de novo to determine their correctness. *See id.*

## B.   Jurisdictional pleading requirements and the burden of proof

A plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the terms of the Texas long-arm statute. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2008); *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden. *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding

9

burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Kelly*, 301 S.W.3d at 658.

If the plaintiff pleads sufficient jurisdictional allegations, the nonresident defendant has the burden of negating all bases of jurisdiction in those allegations. *Id.*; *Moki Mac*, 221 S.W.3d at 574. "Once the defendant has produced credible evidence negating all bases of jurisdiction, the plaintiff bears the ultimate burden to establish that the Texas court has personal jurisdiction over the defendant as a matter of law." *MGM Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 408 (Tex. App.—Corpus Christi 1999, no pet.).

If the plaintiff does not plead sufficient jurisdictional facts, the defendant can meet its burden to negate jurisdiction by proving it is not a Texas resident. *Kelly*, 301 S.W.3d at 658–59. If the plaintiff does plead sufficient jurisdictional facts, "[t]he defendant can negate jurisdiction on either a factual or legal basis." *Id.* at 659. Among the ways to negate jurisdiction, "the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; [or,] for specific jurisdiction, that the claims do not arise from the contacts[.]" *Id.*

## C. Pleadings and evidence before the district court

On appeal, Wellness relies on its allegations in a petition and brief that were filed after the February 10 hearing as well as statements in a post-hearing affidavit. Vita and Mazanet contend that these filings were untimely and therefore we should not consider them in our analysis. Before engaging in the personal jurisdiction analysis, we examine what filings were properly before the court when it issued its ruling on the special appearance.

At the time of the February 10 hearing on the special appearance, Wellness's live pleadings were its "Amended Third Supplemental Petition" and its "Fourth Supplemental Petition" filed on January 19, 2012.[2] After the hearing, Wellness filed its Fifth Supplemental Petition as well an additional brief, "comments," pleadings, and evidence addressing the special appearance.

### 1. Amended pleading

Absent leave of court to file otherwise late pleadings and evidence, we cannot consider them in reviewing the trial court's order. Under Rule 120a, a court "shall determine the special appearance on the basis of the pleadings." TEX R. CIV. P. 120a(3). This rule has been interpreted to require the pleadings to be on file at

---

[2] It appears that Wellness mistakenly identified the third, fourth, and fifth petitions as "supplemental" petitions. But it is clear that they are not supplemental petitions; rather, they are amended petitions that restate prior allegations regarding service, the facts, and the causes of action while adding new allegations.

11

the time of the hearing. *See Frank A. Smith Sales, Inc. v. Atl. Aero, Inc.*, 31 S.W.3d 742, 747 (Tex. App.—Corpus Christi 2000, no pet.) ("The meaning of the term 'pleadings' must be limited at least so as to exclude matters not filed prior to the special appearance hearing."); *Botter*, 124 S.W.3d at 860 n.1 (adopting same rule and refusing to consider amended petition filed after hearing); *see also Hussong v. Schwan's Sales Enters., Inc.*, 896 S.W.2d 320, 323 (Tex. App.—Houston [1st Dist.] 1995, no pet.) (noting that in summary-judgment context, "a trial court can only consider pleadings and proof on file at the time of the hearing, or filed after the hearing and before judgment with the permission of the court."); *Leinen v. Buffington's Bayou City Serv. Co.*, 824 S.W.2d 682, 685 (Tex. App.—Houston [14th Dist.] 1992, no writ) (same). This limitation is particularly important in a special appearance proceeding because "the pleadings are essential to frame the jurisdictional dispute" and because "the plaintiff and the defendant bear shifting burdens of proof." *Kelly*, 301 S.W.3d at 658 & n.4.

Wellness contends that the trial court granted leave to file an amended pleading during the February 10 hearing. The court stated that it would give Wellness "two weeks from today to fix [the] pleading." However, a court employee communicated three days later by email that the judge intended to grant the special appearance before Wellness filed its amended pleading. Vita and Mazanet initially informed the court by letter that they did not intend to respond to

12

the new allegations; however, they subsequently filed a general denial "out of an abundance of caution subject to Defendants' previously filed Special Appearance." The court never signed an order either granting leave to amend the pleading or striking the amended pleading.

After the court ruled on the special appearance and entered its findings, Wellness requested an "amended judgment" and "modified" fact findings and conclusions of law based on the new pleading and on other contentions it had made. Its proposed fact findings and legal conclusions would have resulted in the trial court overruling the special appearance. Vita and Mazanet filed objections to the motion on multiple grounds, including that the motion was untimely and that the newly alleged jurisdictional facts in the Fifth Supplemental Petition still failed to establish personal jurisdiction.

Under these circumstances, we will presume that the trial court granted Wellness leave to amend its pleading at the February 10 hearing and did not revoke that ruling. Texas Rule of Civil Procedure 63 provides that, in general, "[p]arties may amend their pleadings . . . as they may desire by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite party[.]" TEX. R. CIV. P. 63. This rule is given a "liberal interpretation." *Goswami v. Metro. Sav. and Loan Ass'n*, 751 S.W.2d 487, 490 (Tex. 1988). "Texas courts have held that in the absence of a sufficient showing of surprise by the opposing party, the failure to

obtain leave of court when filing a late pleading may be cured by the trial court's action in considering the amended pleading." *Id.*

The reporter's record reflects that the trial court suggested at the February 10 hearing that Wellness "tighten up" its petition and expressly allowed Wellness two weeks to do so. Although a court employee emailed information several days later indicating that the court no longer required briefing and would grant the special appearances, this email is clearly not an order of the court. The trial court delayed over two months after Wellness filed its Fifth Supplemental Petition before formally ruling on the special appearances. Moreover, Vita and Mazanet have not argued that they were surprised or prejudiced by the Fifth Supplemental Petition. Under these circumstances, we presume that the trial court expressly granted leave to file the amended pleading on February 10 and did not revoke that ruling. *Cf. Patterson v. First Nat'l Bank of Lake Jackson*, 921 S.W.2d 240, 244 (Tex. App.— Houston [14th Dist.] 1996, no writ) (corrected op.) (concluding that "the trial court implicitly granted appellant leave to file the amended pleading" by expressly allowing appellant to file countermotion for summary judgment that necessarily required amended pleading).

### 2. Affidavit

The parties also dispute whether we may consider Angelides's affidavit. A trial court may consider affidavits but only if they are "served at least seven days

before the hearing." TEX. R. CIV. P. 120a(3). Vita and Mazanet contend that Angelides's affidavit was filed only in connection with a summary-judgment motion filed by a different defendant and therefore it may not be considered with respect to the special appearances. *Cf. Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002) ("[A] court . . . must consider only plaintiffs' pleadings and the evidence pertinent to the jurisdictional inquiry.").

It is unnecessary for us to determine whether we should consider Angelides's affidavit as constituting part of the jurisdictional evidence before the trial court when it ruled on the special appearances. *See* TEX. R. APP. P. 47.1. Assuming, without deciding, that Wellness properly presented Angelides's affidavit as evidence against the special appearances, we conclude for the reasons below that Wellness did not meet its burden to establish personal jurisdiction over Vita and Mazanet.

## D. Substantive law

A Texas court may assert personal jurisdiction over a nonresident defendant if it satisfies (1) the requirements of the Texas long-arm statute and (2) federal constitutional due-process guarantees. *Moki Mac*, 221 S.W.3d at 574. "Because the Texas long-arm statute reaches 'as far as the federal constitutional requirements of due process will allow,' the statute is satisfied if the exercise of personal jurisdiction comports with federal due process." *PreussagAktiengesellschaft v.*

15

*Coleman*, 16 S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.) (quoting *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996)). We thus examine only whether a Texas court's exercise of jurisdiction over Vita and Mazanet would comport with the requirements of federal due process. *See CSR*, 925 S.W.2d at 594.

Personal jurisdiction is proper when the nonresident defendant has purposefully established minimum contacts with the forum state such that it could reasonably anticipate being sued there and the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Moki Mac*, 221 S.W.3d at 575 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant has purposefully availed itself of the privileges of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Id.* (citing *Hanson,* 357 U.S. at 253, 78 S. Ct. at 1240).

There are two types of personal jurisdiction: general and specific. Wellness contends that Vita's and Mazanet's contacts with Texas are sufficient to establish both general and specific personal jurisdiction over each of them. We review each type of personal jurisdiction in turn. But first, we examine the factual sufficiency challenges.

16

## Wellness's Factual Sufficiency Challenges

In its first issue, Wellness challenges seven fact findings. Wellness has not, however, identified any pleadings or evidence that controverts six of these findings; rather, Wellness complains only that they are incomplete.[3] Wellness asserts that fact finding nine ("Neither Vita nor Mazanet every received any compensation from Diabetes America.") is contrary to "uncontradicted evidence" that Vita received a salary for his services at Diabetes America. However, the evidence in the record cited by Wellness actually shows that Vita and Mazanet performed services for Diabetes America for which they were entitled to payment but had not yet received payment.

Wellness also challenges the trial court's failure to make eight proposed fact findings regarding "significant uncontroverted contacts between [Vita and Mazanet] and Texas." A trial court is not required to make findings on every disputed issue. *See Mladenka v. Mladenka*, 130 S.W.3d 397, 409 (Tex. App.—Houston [14th Dist.] 2004, no pet.). It is enough that the trial court make findings on sufficient fact issues to resolve the legal issue presented. *See Boudreaux Civic Ass'n v. Cox*, 882 S.W.2d 543, 550 (Tex. App.—Houston [1st Dist.] 1994, no writ) (stating that, under Rule 298 pertaining to requests for additional or amending

---

[3] Wellness does not assert that fact findings two, three, four, five, six, and eleven are inaccurate; it only asserts that additional details should have been included for these findings.

17

findings of fact and conclusions of law, "[a]dditional findings of fact are required only when they are necessary to determine ultimate or controlling issues"). To the extent that the trial court may have failed to make particular fact findings relevant to the legal conclusions, we will accept the uncontroverted pleadings and evidence presented by Wellness.

We overrule Wellness's first issue.

## Challenge to Legal Conclusions

Wellness challenges eight conclusions of law in which the trial court determined that it did not have general or specific jurisdiction over Vita and Mazanet.[4]

### A.     General Jurisdiction

General jurisdiction will attach when "a defendant's contacts in a forum are continuous and systematic permitting the forum to exercise personal jurisdiction

---

[4]     Wellness, in the "issues presented" section of its brief, counts six challenges to conclusions of law but its brief substantively challenges eight conclusions. Specifically, the "issue presented" section does not challenge the trial court's twenty-fourth conclusion of law ("The fiduciary shield doctrine applies because Mazanet and Vita's minimal contacts with Texas were made in their capacity as corporate officers.") or twenty-fifth conclusion of law (Vita and Mazanet's "contacts with Texas were not continuous or systematic. . . . and the fiduciary shield doctrine prevents the Court from exercising general jurisdiction."). In its brief, however, Wellness asserts that these conclusions are in error. Therefore, Wellness's challenges to these issues are properly presented for our consideration. *See* TEX. R. APP. P. 38.1(f) (providing that appellate "brief must state concisely all issues or points presented for review" and "statement of an issue or point will be treated as covering every subsidiary question that is fairly included").

18

over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state." *CSR*, 925 S.W.2d at 595. The central question for the general-jurisdiction inquiry is whether the defendants' contacts are so "continuous and systematic" that the relationship between the nonresidents and the state approaches the relationship between the state and its own residents. *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007). General jurisdiction requires a "more demanding minimum contacts analysis" than a specific-jurisdiction inquiry, *id.* (quoting *CSR*, 925 S.W.2d at 595), with a "substantially higher" threshold, *id.* (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (2007)). Usually, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." *Id.* (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5). General jurisdiction exists when the nonresident is deemed to have consented to jurisdiction through its continuous contact invoking the benefits and protections of Texas law. *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 808 (Tex. 2002). This analysis focuses on the nature and quality of the contacts, as opposed to the quantity. *Id.* at 810.

A court examines the defendant's forum-related activities for a reasonable number of years up to the time of the filing of the lawsuit. *PHC–Minden*, 235 S.W.3d at 169. A general-jurisdiction inquiry can be tedious, as it "demands . . . that all contacts be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity." *Id.* at 170 (quoting *Schlobohm v. Schapiro*, 784 S.W.2d 355, 359 (Tex. 1990)). In conducting this dispute-blind inquiry, the location of Wellness's headquarters and its choice not to sue Diabetes America are irrelevant. *See id.* General jurisdiction examines the defendant's activities that occur in the forum, not merely those that are related to the forum. *See CSR*, 925 S.W.2d at 595 ("General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction.").

Vita and Mazanet are residents of New York and Connecticut, respectively. Wellness does not contend that they own any Texas property or bank account or that they have a registered agent for service of process here. Instead, Wellness relies on seven categories of contacts to demonstrate continuous and systematic contacts:

> (1) Actions taken by Diabetes America, a corporation with its principal place of business and a number of health centers in Texas;

(2) Duties Vita and Mazanet performed for Diabetes America in Texas, including travel to Texas in connection with their work for Diabetes America;[5]

(3) Actions taken by Argenis in Texas, including loans to Diabetes America and filing a UCC financing statement in order to perfect its loans;

(4) Duties Vita and Mazanet performed for Argenis in Texas;

(5) Vita's approach to Angelides to become a director of Wellness and his subsequent actions taken as "active" director of Wellness;

(6) A lawsuit filed by Mazanet in a Texas bankruptcy court for reimbursement of loans, expenses, and compensation from Diabetes America; and

(7) The formation in 2011 of Diabetes America – Texas, LLC, a Texas company, where in the formation documents Vita and Mazanet are identified as initial managers.

Wellness's first and third categories presume that activities of entities doing business in Texas can be imputed to an individual defendant when the individual is a director or officer of the entity (as in the case of Diabetes America) or is a principal of the entity (as in the case of Argenis).[6] Texas courts have adopted the fiduciary-shield doctrine to protect "a corporate officer or employee from the trial

---

[5] The amount of travel, according to the trial court's fact finding number ten, was rare. Wellness does not contest this fact finding and cites to evidence of only two trips to Houston by Vita.

[6] Wellness does not explain how the third category—Argenis filing a financing statement in Texas—can be imputed to Vita and Martinez except to generally state that they controlled Argenis and that they violated their fiduciary duties to Diabetes America by prioritizing Argenis's lien against Diabetes America. But Wellness does not have standing to complain of a breach of duty to Diabetes America.

court's exercise of general personal jurisdiction when all of the individual's contacts with Texas were on behalf of his employer." *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 250 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *see also Brown v. Gen. Brick Sales Co., Inc.*, 39 S.W.3d 291, 297–98 (Tex. App.—Fort Worth 2001, no pet.) (explaining doctrine in similar terms). The rule applies only to assertions of general jurisdiction, not specific jurisdiction. *Shapolsky v. Brewton*, 56 S.W.3d 120, 133 n.6 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *Brown*, 39 S.W.3d at 297–98).[7]

There is an exception to the fiduciary-shield doctrine: jurisdiction over an individual associated with a corporation may be based on the corporation's activities when the corporation is the alter ego of the individual. *BMC Software,* 83 S.W.3d at 798; *Tabacinic v. Frazier*, 372 S.W.3d 658, 669 (Tex. App.—Dallas

---

[7] While corporate agents are individually liable for fraudulent or tortious acts committed in the course of their service of their corporation, *Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex. App.—Houston [14th Dist.] 2001, pet. denied), that rule does not make them subject to general jurisdiction in the forum where the acts occurred; an inquiry into whether their tortious acts create personal jurisdiction is a specific-jurisdiction inquiry. *See Tabacinic v. Frazier*, 372 S.W.3d 658, 668–69 (Tex. App.—Dallas 2012, no pet.) (holding that fiduciary-shield doctrine did not apply to protect defendants from specific jurisdiction when plaintiff alleged individual defendants committed tortious acts while working for corporation); *Pessina v. Rosson*, 77 S.W.3d 293, 300 (Tex. App.—Austin 2001, pet. denied) (holding that fiduciary-shield doctrine did not prevent court from asserting specific jurisdiction over defendant because claim concerns tortious conduct by defendant individually); *Shapolsky*, 56 S.W.3d at 133–34 (same).

2012, no pet.); *Davey v. Shaw,* 225 S.W.3d 843, 856 (Tex. App.—Dallas 2007, no pet.). It is the plaintiff's burden to establish that the individual was an alter ego of his employer. *Tabacinic*, 372 S.W.3d at 669; *Brown*, 39 S.W.3d at 298. But Wellness does not rely on this exception. Thus, we do not consider the first or third of these categories of activities, absent evidence that Vita and Mazanet themselves acted in Texas on behalf of those entities. The relevant legal inquiry is the activities of Vita and Mazanet in Texas, whether in their individual capacities or acting on behalf of a third party.

Turning to the second category—activities that Vita and Mazanet performed in Texas for Diabetes America—Wellness relies on its description of those activities in the uncontroverted statement in its Fifth Amended Petition: "Mazanet and Vita spent time in Houston directing company activities for, negotiating financings and loans for [Diabetes America] and/or attending Board of Directors meetings, managements meetings and other meetings, both telephonically and in person over a period of several years, in their roles as directors and executives at [Diabetes America]." While it is clear that the meetings and activities occurred before the filing of this lawsuit, Wellness did not describe the amount of time spent in Houston, the quantity of personal meetings (as opposed to telephonic meetings)

held in Texas, the length of the meetings, or the purposes of the meetings.[8] In finding of fact ten, the court found that Vita and Mazanet "participated in most board meetings telephonically from outside Texas," a finding that Wellness does not contest. Vita's and Mazanet's isolated business trips to Texas as part of their duties for Diabetes America[9] are likewise insufficient to create general jurisdiction over them. Isolated trips to Texas "fall short of the 'continuous and systematic contact' the Supreme Court requires." *PHC–Minden*, 235 S.W.3d at 170. Indeed, even multiple trips to Texas are insufficient to create general jurisdiction when those trips do not "in any way enhance[]" the nonresident's contacts with Texas. *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418, 104 S. Ct. 1868, 1874 (1984)).

Turning to the fourth category—activities performed on Argenis's behalf—Wellness contends that Vita and Mazanet in their capacity as principals of Argenis "were involved in negotiating and consummating the purchase of Diabetes

---

[8]     In a separate paragraph in the Fifth Amended Petition, Wellness further asserted that Vita and Mazanet negotiated Argenis's purchase of Diabetes America's stock but did not allege the location of those meetings. It further asserted that Vita "had discussions . . . through email regarding" Wellness. Wellness's petition did not, however, identify the person with whom Vita communicated by email or the location of either the author or recipient at the time of the emails.

[9]     The Court found that "[w]hile serving as directors of Diabetes America, Vita and Mazanet rarely traveled to Texas." Wellness does not challenge this finding, either.

America's stock for Argenis funds."[10] Wellness did not plead or present evidence that these activities occurred in Texas or evidence concerning the extent of the activities.

The fifth category—Vita's approach to Angelides to become a Wellness director and activities as an "active" director—is insufficient to confer jurisdiction over Vita.[11] Angelides's affidavit states that Vita approached him in the summer of 2007, after Vita was serving as a board member for Diabetes America. Angelides, however, did not connect Vita's activities with Texas; he did not identify the location of this initial conversation or state whether the conversation was in-person or telephonic. Angelides's affidavit also indicated that Vita "was active as a director in not only [Wellness's] business but also in trying to solicit additional investors and investment funds into" it. Regarding Vita's activities as a Wellness director and soliciting investors, Angelides again did not connect this with Texas, nor did he offer any details about the extent of the work. In the end, these activities all simply show that Vita worked with and on behalf of Wellness, a Texas-based

---

[10]     The contention appears in both the Fourth and Fifth Amended Petitions.

[11]     When, as here, there are multiple defendants, we must test each defendant's actions and contacts with the forum separately. *Gen. Elec. Co. v. Brown & Ross Int'l Distribs., Inc.*, 804 S.W.2d 527, 532 (Tex.App.—Houston [1st Dist.] 1990, writ denied).

corporation; otherwise, in the record before this Court, Vita's activities are not connected to Texas.

The sixth category—Mazanet's bankruptcy claim in Texas—is insufficient to confer jurisdiction over Vita; a single bankruptcy claim does not constitute continuous and systematic activities by Mazanet. *See PHC-Minden*, 235 S.W.3d at 168 (noting that to support general jurisdiction, usually "the defendant must be engaged in longstanding business in the forum state" (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5)); *CMMC v. Salinas*, 929 S.W.2d 435, 439 (Tex. 1996) (observing that single or occasional acts do not support personal jurisdiction when they create only attenuated affiliation with forum).

In its seventh category, Wellness also relies on Vita's and Mazanet's positions as managers of a Diabetes America – Texas, LLC, a Texas company. That entity came into existence in January 2011, approximately eight months before this suit was filed. But Wellness has not alleged or shown any action taken in Texas by Vita or Mazanet in their management roles with that entity.

When we consider the totality of the facts that Wellness relies upon, we conclude that Vita's and Mazanet's contacts with Texas are not continuous and systematic and are not sufficient to exercise general jurisdiction over them.

26

**B.     Specific Jurisdiction**

Specific jurisdiction is based on the incident that is the basis for the suit and the defendant's contacts with the state in connection with that incident. *Moki Mak*, 221 S.W.3d at 575–76. Thus, the specific-jurisdiction inquiry focuses on the relationship among the defendant, the forum, and the litigation. *Id.* (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)); *see also Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 789–90 (Tex. 2005) (rejecting focus on whether injury suffered by plaintiff occurred in Texas, and stating that focus is on defendant's conduct).

Specific jurisdiction requires satisfaction of "two co-equal components": (1) the nonresident purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there and (2) the cause of action arises out of or is related to those contacts with the forum state. *Moki Mac*, 221 S.W.3d at 576, 579. "For half a century the touchstone of jurisdictional due process has been 'purposeful availment.'" *Michiana*, 168 S.W.3d at 784. Since *Hanson v. Denckla*, "it is essential in each case that there be some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (quoting *Hanson*, 357 U.S. at 253, 78 S. Ct. at 1240 (emphasis supplied by quotation)).

27

To conclude that a nonresident company purposefully availed itself of a forum, a court must do three things: (1) examine only the defendant's contacts with the forum, not those of the plaintiff or any third person; (2) decide that the defendant's acts with the forum were purposeful rather than random, isolated, or fortuitous; and (3) determine that the defendant was seeking some benefit, advantage or profit by availing itself of the jurisdiction. *Michiana*, 168 S.W.3d at 785.

Wellness's claim arises out of the Diabetes America board of directors' unanimous approval of the 2010 InfoPia settlement at a telephonic board meeting. Both Vita and Mazanet participated in that meeting by telephone from outside Texas. There is no evidence in the record about the location of the third board member, Groesser, at the time of the board meeting, although it is undisputed that she is a Texas resident. Vita, while in New York, signed the settlement agreement on behalf of Diabetes America. The settlement agreement is governed by Florida law and requires Diabetes America to litigate any dispute it has in Brevard County, Florida and InfoPia to litigate any dispute it has in Harris County, Texas. At the time the settlement was approved, Wellness had already ceased operations, its Delaware corporate status was forfeited, and its status as a foreign for-profit corporation in Texas was also forfeited.

The thrust of Wellness's argument for specific jurisdiction is that "the non-resident Defendants knew, or had good reason to know, that their conduct in agreeing and entering the 2010 Settlement Agreement and Mutual Release would have effects in Texas (*i.e.*, depriving Plaintiff of its assigned rights to payments from Infopia)[.]" However, the Texas Supreme Court "has expressly rejected jurisdiction 'based solely upon the effects or consequences of an alleged conspiracy' in the forum state." *Michiana*, 168 S.W.3d at 789 (quoting *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995)). "Although foreseeability is a factor to consider in a minimum contacts analysis, foreseeability alone will not support personal jurisdiction." *CSR*, 925 S.W.2d at 595.[12] "The defendant must take an action '*purposefully directed* toward the forum state' to be subject to the jurisdiction of its courts." *Id.* (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 112, 107 S. Ct. 1026, 1032 (1987) (emphasis supplied by quotation)).

Wellness's proposed jurisdictional analysis would impermissibly shift our focus from the relationship among the defendants, the forum, and the litigation, to

---

[12] Even if foreseeability alone could support personal jurisdiction, the record here suggests that Vita and Mazanet did not foresee any injury to Wellness as a consequence of approving the 2010 Settlement Agreement and Mutual Release. By Wellness's own pleadings and evidence, Wellness ceased operations in October or November of 2008. Its Delaware corporate status was forfeited in October of 2009. Wellness does not explain how Vita and Mazanet could have foreseen that the settlement agreement, executed in February 2010, would injure a non-operating, non-existent entity.

the relationship among the plaintiff, the forum, and the litigation. *See Michiana*, 168 S.W.3d at 790. Instead, the specific-jurisdiction analysis "always centers on the *defendant's* actions and choices to enter the forum state and conduct business." *Kelly*, 301 S.W.3d at 660 (emphasis in original). Wellness must therefore plead and present evidence that Vita's and Mazanet's relevant acts occurred, at least in part, in Texas. *Id.* at 660–61.

The record reveals that Vita and Mazanet had virtually no Texas contacts related to or connected with the 2010 Settlement Agreement and Mutual Release. During the telephonic board meeting to approve the agreement, Vita and Mazanet were not in Texas. Wellness argues that because Groesser, another Diabetes America board member, was a Texas resident, there is an inference that she participated in that phone call while in Texas, and therefore Vita and Mazanet had contact with Texas when the settlement agreement was approved. However, even if such an inference about Groesser's whereabouts were made, that contact with Texas was merely fortuitous and does not show that Vita and Mazanet "purposefully availed" themselves of the privilege of conducting activities in Texas, thereby invoking the benefits and protections of her laws. *See Hanson*, 357 U.S. at 253, 78 S. Ct. at 1240; *see also Michiana*, 168 S.W.3d at 791 ("[C]hanges in technology have made reliance on phone calls obsolete as proof of purposeful

30

availment."). Moreover, as the trial court found and Wellness does not contest, Vita signed the 2010 Settlement Agreement and Mutual Release in New York.

Because foreseeability of an injury alone does not support exercise of personal jurisdiction over a nonresident defendant, and the record reveals that virtually all of the activities by Vita and Mazanet related to or connected with the 2010 Settlement Agreement and Mutual Release occurred outside Texas, we conclude that Wellness has failed to plead and prove contacts with Texas that are substantially connected to the operative facts of the litigation. Accordingly, Wellness did not establish specific jurisdiction over Vita and Mazanet.

## Conclusion

Wellness failed to establish either general or specific personal jurisdiction over Vita and Mazanet. We therefore affirm the trial court's order granting Vita's and Mazanet's special appearances. All outstanding motions are overruled as moot.

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.