2025 Tex. Bus. 41



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| JT Capital LLC, *Plaintiff* | § | |
| v. | § | |
| | § | |
| BLOM CAPITAL LLC, 599 W. PRINCETON LP, CAPELLA FUNDS LLC, CORINNE CORDON, JOSEPH SEBASTIEN, RICHARD NEUHARTH, and MOSES LUCERO, *Defendants* | § | Cause No. 25-BC01B-0019 |
| v. | § | |
| SAPAN TALATI, STRATEGIC INCOME JTM LP, and JT CAPITAL FUND, LLC *Third-Party Defendants.* | § | |

## MEMORANDUM OPINION

[¶ 1]  A California resident argues that this court lacks personal jurisdiction over him because he did not commit any tortious acts while in Texas.  Because the respondents did not plead or prove that this defendant has

sufficient Texas contacts giving rise to the claims against him to support personal jurisdiction over him for any pled cause of action, the court granted the non-resident's special appearances and dismissed the claims against him without prejudice.

## I. BACKGROUND

### A. Factual Background

[¶ 2]  After learning of each other's shared interest in real property located at 599 W. Princeton Drive, Princeton, Texas 75047 (Property), Blom Capital LLC and JT Capital LLC discussed forming a joint venture to acquire and manage the Property (Project).[1]  Before the joint venture was formed, the then owner, Princeton Luxury Apartments LLC, defaulted on its mortgage loan and the lender sought to foreclose on the Property.[2]  To prevent foreclosure, JT Capital, Blom, and Capella Funds LLC (which became an additional lender) agreed to contribute funds to purchase the loan and the lender postponed foreclosure until January 2025.[3]

---

[1] Plaintiff's Second Amended Original Petition (SAP) ¶s 22–23.
[2] SAP ¶s 24, 26.
[3] SAP ¶s 29, 32.

[¶ 3]  Throughout December 2024, JT Capital, Blom, and Capella discussed how to acquire the loan.[4]  JT Capital agreed to contribute $3.5 million towards that purchase, which it says was a loan so Blom could acquire the Property for the proposed joint venture's benefit.[5]

[¶ 4]  Blom later formed the partnership 599 W. Princeton LP (Partnership) and executed an amended Purchase and Sale Agreement with Princeton Luxury, designating the Partnership as the Property's purchaser.[6]

[¶ 5]  JT Capital was allegedly unaware of these events and claims Blom and Capella formed the Partnership to acquire the Property without JT Capital.[7]

[¶ 6]  Nevertheless, JT Capital kept working with Blom and Capella based on representations that Blom still desired to create the proposed joint venture.[8]  Thus, JT Capital and Blom signed a joint venture term sheet.[9]  The term sheet required repayment of JT Capital's $3.5 million loan to purchase

---

[4] SAP ¶s 37–39.
[5] SAP ¶s 31, 34–35.
[6] SAP ¶ 46.
[7] SAP ¶s 46–47.
[8] SAP ¶ 57.
[9] SAP ¶ 66.

the Property's mortgage.[10]  Despite agreeing to the term sheet, JT Capital's

and Blom's relationship continued to deteriorate.[11]

## B. Procedural Background

[¶ 7]  After JT Capital sued in Collin County, all parties agreed to

remove the case to this court.[12]  Defendants Blom and Capella later filed

counterclaims/third-party claims against JT Capital and its officer Sapan

Talati.[13]

[¶ 8]  Talati specially appeared and the parties briefed the issue.[14]  All

parties' submissions included jurisdictional discovery.

## C. Jurisdictional Facts

[¶ 9]  The court considers allegations and evidence contained in both

Blom's Second Amended Counterclaims and Amended Third-Party Petition

(Blom's Am. 3rd Party Pet.), Capella's Second Amended Answer and

---

[10] SAP ¶s 65–66.

[11] SAP ¶s 69, 71.

[12] JT Capital LLC's Original Petition; Agreed Notice of Removal.

[13] The live pleadings currently are Blom's Second Amended Counterclaims and Amended Third-Party Petition (Blom's Am. 3rd Party Pet.) and Capella's Second Amended Answer and Counterclaims (Capella's SAAC).

[14] Talati's 07/14/2025 Special Appearance to Blom (Talati's Blom SA); Talati's 08/15/25 Amended Special Appearance (Talati's Am. Blom SA); Talati's 08/18/2025 Special Appearance to Capella (Talati's Capella SA); Blom's 08/29/2025 Response to Talati's Am. Blom SA (Blom's Resp.); Capella's 08/29/2025 Response to Talati's Capella SA (Capella's Resp.); Talati's 09/03/2025 Reply to Blom's Resp. (Talati's Blom Reply); Talati's 09/03/2025 Reply to Capella's Resp. (Talati's Capella Reply).

Counterclaims (SAAC), Talati's Declaration, and related evidence submitted in response to Talati's special appearance. The court does not consider allegations made outside of Blom's Am. 3rd Party Pet. or Capella's SAAC and only considers additional evidence to the extent it supports or undermines the allegations in those pleadings.

[¶ 10]   Blom's and Capella's submissions allege that:

- Talati resides in either California or Texas.[15]

- Talati pursued the idea to form and invest in a Texas-based joint venture to acquire, develop, and manage the Property.[16]

- Talati made multiple misrepresentations, including that (i) JT Capital would be a 50/50 partner with Blom and share equally in obligations, responsibilities, and profits associated with the Property acquisition; (ii) JT Capital would pay remediation costs, obtain and pay for insurance, pay property taxes, and address liens; (iii) JT Capital's contribution would be repaid following sufficient capital or debt raise, but later JT Capital demanded that it be paid back with interest in exchange for relinquishing all rights in the proposed joint venture and Property; (iv) Talati would prepare a private placement memorandum, a joint development agreement, and disclosures for a schedule of real estate owned; and (v) Talati would serve as a personal guarantor of the loan and lead sponsor for the Property acquisition.[17]

---

[15] Blom's Am. 3rd Party Pet. ¶ 5.
[16] Capella's SAAC ¶s 11, 17, 24.
[17] Blom's Am. 3rd Party Pet. ¶s 9, 36, 39, 50, 57; Capella's SAAC ¶s 21–22, 24, 30–31, 34.

- Talati negotiated with Blom and Capella to structure agreements, loans, entities to purchase the Property, and the repayment of funds.[18]

- Talati defrauded the Project of $500,000 for his own benefit.[19]

[¶ 11]   Blom and Capella provided the following evidence in support of their allegations:

- Talati knowingly communicated with individuals who lived in Texas.[20]

- Talati indirectly owns two other properties in Crowley, Texas and mineral interests in Tarrant County, Texas.[21]

- Talati owns a multi-residential property at The Lakes at Renaissance Park in Austin, Texas and now claims an interest in the Property in Princeton, Texas.[22]

- Talati oversaw JT Capital's strategy and investment decisions, served as its primary point of contact, and directed JT Capital in the attempted Property acquisition.[23]

- The joint venture term sheet signature page contains Talati's signature.[24]

- Talati sent and received hundreds of emails, text messages, and Slack communications concerning the purchase, development, and management of the Property.[25]

---

[18] Capella's SAAC ¶s 23, 44–45, 50.

[19] Blom's Am. 3rd Party Pet. ¶s 23, 27, 67, 70.

[20] App'x to Blom's Resp. at 049.

[21] App'x to Capella's Resp. at 009–10, 020–21.

[22] App'x to Capella's Resp. at 017–18.

[23] App'x to Blom's Resp. at 004, 034–36; App'x to Capella's Resp. at 018.

[24] App'x to Capella's Resp. at 025.

[25] App'x to Blom's Resp. at 004.

- Talati misrepresented that: (i) JT Capital's $3.5 million contribution would be repaid following a sufficient capital or debt raise and that Talati would work on the necessary documentation for acquiring the Property; (ii) JT Capital would relinquish all rights in the proposed joint venture and the Property, including profits, upon JT Capital being paid back with interest on its contribution; (iii) JT Capital would be a 50/50 partner with Blom and JT Capital would share in remediation costs, obtain insurance, and pay for insurance and property taxes; and (iv) he would be the personal guarantor of the loan and lead sponsor for the Property's acquisition.[26]

- Talati told his wife he would treat the allegedly misappropriated $500,000 as an acquisition fee.[27]

- Talati directed JT Capital to bring forth this lawsuit.[28]

### D. Parties' Arguments

#### 1. Talati

[¶ 12]   Talati argued that (i) he is not subject to general jurisdiction, and is protected by the fiduciary shield doctrine because he acted solely as a JT Capital officer;[29] (ii) he is not subject to specific jurisdiction because neither Blom nor Capella alleged that Talati performed acts in Texas on his own behalf giving rise to this dispute, other than "vaguely reference[d] conversations

---

[26] App'x to Blom's Resp. at 004–05, 008, 012, 016–017, 021, 025, 038–39; App'x to Capella's Resp. at 026–027.
[27] App'x to Blom's Resp. at 007–08.
[28] App'x to Blom's Resp. at 009.
[29] Talati's Am. Blom SA at 11, 15; Talati's Capella SA at 11, 15.

and/or alleged tortious misrepresentations;"[30] and (iii) he had no physical contact with Texas throughout the proposed joint venture.[31]

### 2.    Capella

[¶ 13]   Capella responded that through both direct and indirect ownership interests and management, Talati (i) maintained ongoing affiliations with Texas entities and (ii) targeted the Texas market, granting this court general personal jurisdiction.[32]

[¶ 14]   Capella also argued that Talati's actions "as a decision maker and principal of JT Capital" establish sufficient minimum contacts with Texas for specific jurisdiction.[33]  To that end, Capella focused on Talati (i) directing JT Capital, (ii) working with Blom and Capella to purchase the note and Property, (iii) misrepresenting his intent to help acquire the Property, and (iv) receiving financial benefits.[34]

[¶ 15]   Capella further argued that the fiduciary shield doctrine does not apply to Talati's personal tortious or fraudulent acts.[35]

---

[30] Talati's Am. Blom SA at 16; Talati's Capella SA at 16.
[31] Talati's Am. Blom SA at 6; Talati's Capella SA at 6.
[32] Capella's Resp. at 16.
[33] Capella's Resp. at 17.
[34] Capella's Resp. at 17, 19–21 (citing Exhibits H–K).
[35] Capella's Resp. at 13.

### 3. Blom

[¶ 16]  Blom argued many of the same bases as Capella but did not assert general jurisdiction.[36]

## II.  APPLICABLE LAW

### A. Special Appearances

[¶ 17]  Rule of Civil Procedure 120a governs special appearances. TEX. R. CIV. P. 120a(1).

### B. *In Personam* Jurisdiction

[¶ 18]  A nonresident defendant is subject to personal jurisdiction in Texas if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007).

[¶ 19]  The long-arm statute permits courts to exercise jurisdiction over a defendant who "does business in this state," which includes a nonresident defendant who "commits a tort in whole or in part in this state." *LG Chem.*

---

[36] *See generally* Blom's Resp.

*Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023) (quoting TEX. CIV. PRAC. & REM. CODE § 17.042(2)).

[¶ 20]  The statute's broad "doing business" language allows the statute "to reach as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)).

[¶ 21]  Therefore, courts need to analyze only whether the defendant's acts would bring the defendant within Texas's jurisdiction consistent with constitutional due process requirements. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

[¶ 22]  A state's exercise of jurisdiction comports with federal due process when (i) the nonresident established "minimum contacts" with the forum and (ii) the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Moki Mac*, 221 S.W.3d at 575 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

## C. Minimum Contacts

### 1. Introduction

[¶ 23]  A nonresident defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Retamco*, 278 S.W.3d at 338.

[¶ 24]  Courts conduct a three-part purposeful availment inquiry. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005).

[¶ 25]  First, only the defendant's contacts with the forum count—not the "unilateral activity of another party or a third person." *Id.*

[¶ 26]  Second, the acts must be purposeful and not random, isolated, or fortuitous. *Id.*  Accordingly, defendants who "reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)).  But it is not enough that the defendant simply "directed a tort" towards Texas.  *See Michiana*, 168 S.W.3d at 790.

[¶ 27]  Finally, the defendant must seek some benefit, advantage, or profit by "availing itself of the jurisdiction." *Michiana*, 168 S.W.3d at 785.  A defendant may therefore avoid a particular forum by structuring its transactions to neither profit from the forum's laws nor subject itself to jurisdiction there.  *Id.*

[¶ 28]  The minimum-contacts analysis focuses on the "quality and nature of the defendant's contacts," not quantity.  *Retamco*, 278 S.W.3d at 339.  Ultimately, "[t]he defendant's activities whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court."  *Id.* at 338 (quoting *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)).

### 2. General Personal Jurisdiction

[¶ 29]  General jurisdiction involves a court's ability to exercise jurisdiction over a defendant based on any claim, including claims unrelated to the defendant's contacts with the state.  *M&F Worldwide Corp. v. Pepsi*, 512 S.W.3d 878, 885 (Tex. 2017).  Thus, the minimum contacts inquiry is "broader and more demanding" and requires "a showing of substantial

activities in the forum state." *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990).

[¶ 30]  A court has general jurisdiction when a "defendant's contacts 'are so "continuous and systematic" as to render [it] essentially at home in the forum.'" *M&F Worldwide Corp.*, 512 S.W.3d at 885 (alteration in original) (quoting *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 919 (2011)).  This typically requires the defendant to either engage in longstanding business, perform services, or maintain one or more offices in the forum state. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007).

### 3. Specific Personal Jurisdiction

[¶ 31] Specific jurisdiction requires that "(1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Retamco*, 278 S.W.3d at 338 (buying Texas real estate).  The latter requirement lies at the heart of specific jurisdiction "by defining the required nexus between the nonresident defendant, the litigation, and the forum." *Moki Mac*, 221 S.W.3d at 579; *accord. Michiana*, 168 S.W.3d at 790 (the focus of specific jurisdiction must remain on the "relationship among the defendant, the forum, and the litigation") (emphasis removed).

[¶ 32] For a nonresident's forum contacts to support specific jurisdiction, "the defendant's purposeful contacts must be substantially connected to the operative facts of the litigation or form the basis for the cause of action." *Old Republic Nat. Title Ins. Co. v. Bell*, 549 S.W.3d 550, 559–60 (Tex. 2018). The operative facts are those that will be the focus of the trial and will consume most, if not all, of the litigation's attention. *Moki Mac*, 221 S.W.3d at 585.

[¶ 33] Specific jurisdiction cannot be established "where the contact creates only an 'attenuated' affiliation with the forum." *Id.* at 577. For example, the existence or allegation of a conspiracy directed at Texas does not confer jurisdiction. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995). Similarly, mere allegations of wrongdoing are also not sufficient to confer specific jurisdiction. *Old Republic*, 549 S.W.3d at 560. Courts have been cautioned against confusing the judge's and jury's roles by equating the jurisdictional inquiry with the underlying merits. *Id.*

## D. Fair Play and Substantial Justice

[¶ 34] Rarely will exercising jurisdiction over the defendant not satisfy traditional notions of fair play and substantial justice if the minimum contacts requirements are met. *Retamco*, 278 S.W.3d at 341. Nevertheless, courts still

consider these factors to ensure that exercising jurisdiction does not offend traditional notions of fair play and substantial justice:

> (1) burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies.

*Id.* (citing *Burger King*, 471 U.S. at 477–78).

### E. The Parties' Burdens

[¶ 35]  The plaintiff and defendant have shifting burdens of proof in a personal jurisdiction challenge.  *See Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010).  The plaintiff "bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute."  *Id.*  If the plaintiff fails to meet its burden, the defendant needs to prove only that it does not live in Texas.  *Id.* at 658–59.

[¶ 36]  If the plaintiff meets its burden, the defendant must negate all *alleged* bases of personal jurisdiction.  *Id.* at 658.

[¶ 37]  "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to

the allegations in plaintiff's pleading." *Id.* The defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659.

[¶ 38] The defendant can factually negate jurisdiction by presenting evidence it has no contacts with Texas, effectively disproving plaintiff's allegations. *Id.* The plaintiff must then respond with its own evidence affirming its allegations or risk dismissal of its lawsuit. *Id.* However, the court only considers additional evidence—including stipulations, affidavits, attachments, discovery results, and any oral testimony—that support or undermine the pleadings' allegations. *Id.* at 658 n.4 (citing TEX. R. CIV. P. 120a(3)).

[¶ 39] If the plaintiff's evidence is not within the scope of the pleadings' factual allegations, the plaintiff should amend the pleadings for consistency. *Id.* at 659 n.6; *Steward Health Care Sys. LLC v. Saidara*, 633 S.W.3d 120, 129 (Tex. App.—5th Dist. 2021, no pet.) (en banc).

[¶ 40] The defendant can legally negate jurisdiction by showing that even if plaintiff's allegations are true, the evidence is legally insufficient to establish jurisdiction because either (i) the defendant's contacts with Texas fall short of purposeful availment (including that the claims do not arise from

the contacts) or (ii) the exercise of jurisdiction would offend the traditional notions of fair play and substantial justice. *Kelly*, 301 S.W.3d at 659.

### III. DISCUSSION

## A. General Personal Jurisdiction

### 1. Capella's Pleadings are Inadequate.

[¶ 41] Capella asserts that this court has general jurisdiction over Talati due to (i) his interests in other Texas properties and (ii) his role as an officer in other Texas-based business organizations.[37] However, Capella failed to amend its pleadings to include any specific facts supporting its general jurisdiction premise. [38] Therefore, Capella's general jurisdiction argument is procedurally invalid. *See id.* at 658–59. Regardless, Capella's premise also legally fails.

### 2. Capella's Evidence is Inadequate.

#### a. Ownership of Other Texas Real Property

[¶ 42] Capella asserts that general jurisdiction over Talati exists because he (i) personally owns real estate in Arlington, Texas; (ii) initiated a

---

[37] Capella's Resp. at 14.

[38] Blom alleged that Talati could reside in either California or Texas. Blom's Am. 3rd Party Pet. ¶ 5. However, Blom did not assert a claim of general jurisdiction and Talati testified that he lives in California. Accordingly, the court concludes that this allegation was dropped.

lawsuit regarding that property; (iii) owns mineral interests in Tarrant County; and (iv) indirectly owns properties in both Austin and Crowley, Texas, thereby creating a "continuous and systematic" relationship with Texas.[39]

[¶ 43]   But a "continuous and systematic" relationship is insufficient if the defendant's contacts "fail to rise to the level of rendering a defendant '*essentially at home* in the forum.'"   *Old Republic*, 549 S.W.3d at 565 (emphasis in original).

[¶ 44]   Here, Talati testified that he has not (i) lived in Texas, (ii) traveled to Texas since at least 2020, nor (iii) visited the Arlington property in the last twelve years.[40]   Capella does not challenge these facts. Talati's contacts regarding these properties are thus limited to his ownership.

[¶ 45]   Merely owning unrelated property is insufficient to establish general jurisdiction over a nonresident.  *Booth v. Kontomitras*, 485 S.W.3d 461, 480 (Tex. App.—9th Dist. 2016, no pet.) (property ownership insufficient for general jurisdiction unless ownership of the real property is relevant); *Cornerstone Healthcare Group Holding, Inc. v. Nautic Mgmt. VI,*

---

[39] Capella's Resp. at 15.
[40] Talati's Am. Blom SA., Ex. A, ¶ 5.

*L.P.*, 493 S.W.3d 65, 72 (Tex. 2016) (subsidiary's real property ownership did not subject parent company or general partner to Texas jurisdiction).

[¶ 46]  Likewise, Talati's filing an Arlington eviction suit does not create general jurisdiction because it is unrelated to this matter.  *Megadrill Servs. Ltd. v. Brighouse*, 556 S.W.3d 490, 499 (Tex. App.—14th Dist. 2018, no pet.) (participation in one lawsuit does not subject a party to personal jurisdiction in that forum for unrelated matters); *Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin*, 974 S.W.2d 918, 926 (Tex. App.—8th Dist. 1998, no pet.) (suing in a jurisdiction creates personal jurisdiction only when the lawsuits arise from the same general transaction).  Therefore, Talati's ownership of other properties does not establish general jurisdiction.

### b.  Corporate Affiliation with Other Texas Entities

[¶ 47]  Capella asserts that Talati availed himself of Texas's jurisdiction through his ongoing affiliations with multiple Texas entities (other than JT Capital), both as a member and manager.[41]  But mere association with Texas entities does not establish general jurisdiction.  *Gibson*, 897 S.W.2d at 774.

---

[41] Capella's Resp. at 16.

Rather, the test for general jurisdiction is acts "by which the defendant purposefully avails itself" of the forum. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 9 (Tex. 2021). Here, Talati's corporate affiliations with other Texas entities fail to show that he purposefully availed himself of the forum. *See PHC-Minden*, 235 S.W.3d at 168 (defendants must be engaged in substantive acts such as marketing or shipping products).

[¶ 48] Regardless, Talati's contacts with Texas through his corporate affiliation would be protected by the fiduciary shield doctrine. *Tabacinic v. Frazier*, 372 S.W.3d 658, 668 (Tex. App.—5th Dist. 2012, no pet.) ("The fiduciary shield doctrine protects a nonresident corporate officer or employee from the exercise of jurisdiction when all of his contacts with Texas were made on behalf of his employer.").

[¶ 49] To defeat the fiduciary shield doctrine on a claim of general jurisdiction, Capella had to show that these entities were merely Talati's alter ego. *Id.* at 669. Capella did not do so.

### c. Conclusion

[¶ 50] Accordingly, the court concludes that it lacks general personal jurisdiction over Talati.

## B. Specific Personal Jurisdiction

### 1. Introduction

[¶ 51] Both Blom and Capella assert that this court has specific personal jurisdiction over Talati because he

- directed JT Capital to invest in Texas real property;

- directed JT Capital to bring forth this lawsuit;

- made representations related to the proposed joint venture and Property;

- attached himself to the Property as a lead sponsor and personal guarantor of the loan;

- personally benefitted from his involvement with the Property; and

- partnered with Blom and Capella to purchase and manage the Property.

[¶ 52] Talati responds that these arguments must be assessed on a claim-by-claim basis.[42] However, contacts are considered collectively, where "all claims arise from the same forum contacts." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150–51 (Tex. 2013). Here, Blom's and Capella's claims all relate to Talati's alleged representations and actions surrounding

---

[42] Talati's Am. Blom SA at 13 (citing *Moncrief*, 414 S.W.3d at 150–51).

the planned acquisition, investment, and development of the Property. Accordingly, the court considers Talati's forum contacts collectively.

### 2. Talati's Direction of JT Capital

[¶ 53]  Blom's and Capella's first argument rests on Talati's direction of JT Capital.[43]  Their argument is derivative in nature because it relates to JT Capital's contacts with the forum, not Talati's.  For example, Capella asserts that this court has jurisdiction because "[w]hile Talati could have invested in real estate anywhere, he, *through JT Capital*, actively sought out real estate and thereby availed himself of this forum."[44]

[¶ 54] But it is only the defendant's forum contacts that count. *Michiana*, 168 S.W.3d at 785; *see also PHC–Minden*, 235 S.W.3d at 172 (contacts of distinct legal entities must be assessed separately for jurisdictional purposes unless the corporate veil is pierced).  "When an agent negotiates a contract for its principal in Texas, it is the principal who does business in the state not the agent." *Atiq. v. CoTechno Grp., Inc.*, No. 03-13-00762, 2015 WL 6871219, at *5 (Tex. App.—3d Dist. Nov. 4, 2015, pet.

---

[43] Blom's Resp at. 15–16; Capella's Resp. at 17.
[44] Capella's Resp. at 17 (emphasis added).

denied) (mem. op.) (quoting *Mort Kenshin & Co. v. Houston Chronicle Publ'g Co.*, 992 S.W.2d 642, 647 (Tex. App.—14th Dist. 1999, no pet.)).

[¶ 55]   Here, JT Capital chose to do business in Texas, with Talati as its agent.  Blom and Capella nevertheless argue that *Cornerstone* supports these acts being attributed to Talati given his central role targeting the Texas market.[45]  The court disagrees.

[¶ 56]   In *Cornerstone*, a group of equity funds were accused of usurping a corporate opportunity by purchasing Texas hospitals through a string of subsidiaries.  493 S.W.3d at 71.  Both the direct subsidiary created by the funds and the ultimate purchasing subsidiary had Texas principal places of business.  The funds argued that they were not subject to the court's jurisdiction because their contact with the forum was limited to creating and funding the subsidiaries from afar and the contacts of their subsidiaries could not be imputed to them.  The court disagreed because the funds created the subsidiaries as part of one overarching transaction stemming from and benefitting the funds themselves.  *Id.* at 72–73.  Thus, the court held that the

---

[45] Capella's Resp. at 16; Blom's Resp. at 15–16.

defendant group made a purposeful decision to deploy capital into Texas. *Id.* at 73.

[¶ 57]   Here, the parties had ongoing discussions and plans concerning the development and management of the Property post-acquisition.  However, unlike in *Cornerstone*, JT Capital is not a single-purpose entity created solely to acquire the Property; it existed and conducted business across the country well before any of the operative facts occurred and it never acquired the Property.[46]  So, Talati's involvement in forming and managing JT Capital is not merely "one overarching transaction" that led to the acquisition of Texas real estate and therefore JT Capital's contacts cannot be imputed to Talati.  *Cf. id.* at 72.

### 3.  Texas Litigation

[¶ 58]   Likewise, JT Capital's decision to pursue litigation in Texas also does not bestow jurisdiction over Talati.  *See Retamco*, 278 S.W.3d at 338 ("We focus on the defendant's activities and expectations when deciding whether it is proper to call the defendant before a Texas court."); *Moki Mac*, 221 S.W.3d at 575 ("[O]nly the defendant's contacts with the forum are

---

[46] Talati's Capella Reply at 14.

relevant, not the unilateral activity of another party or a third person."); *Michiana*, 168 S.W.3d at 784–85 ("[I]t is essential in each case that there be some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.") (emphasis in original).

[¶ 59]   Here, Blom and Capella did not allege or show that Talati's decision to have JT Capital bring this lawsuit was itself a tort. Therefore, the only relevant contact is JT Capital's not Talati's, and for the reasons stated above, JT Capital's contacts may not be imputed to Talati.

### 4. Corporate Misrepresentations

[¶ 60]   Blom and Capella next argue that Talati made material misrepresentations in his corporate capacity. For example, he represented that JT Capital would pay remediation costs, obtain and pay for insurance, pay property taxes, help prepare documents to raise capital, and address liens.[47]

[¶ 61]   Talati responds that any alleged misrepresentations occurring in his corporate capacity are protected under the fiduciary shield doctrine.[48]

---

[47] Blom's Resp. at 16.
[48] Talati's Am. Blom SA at 15.

[¶ 62]   The court rejects that argument because the fiduciary shield doctrine applies as a defense to only general jurisdiction issues.  *Tabacinic*, 372 S.W.3d at 668; *see also Nikolai v. Strate*, 922 S.W.2d 229, 240 (Tex. App.—2d Dist. 1996, writ denied).  Therefore, Talati would be responsible for any misrepresentations he made—in whatever capacity—if those misrepresentations give rise to the claims.  *See Moki Mac*, 221 S.W.3d at 576 (there must be a nexus between defendant's misrepresentations, and the defendant must purposefully avail itself of the forum).  However, Talati must still purposefully avail himself of the forum.

[¶ 63]   The Texas Supreme Court holds that phone calls and emails sent by nonresident defendants are insufficient evidence of purposeful availment because the recipients receiving those communications in Texas are generally fortuitous and the result of a third party's unilateral activity.  *See Old Republic*, 549 S.W.3d at 560 (connections between phone calls and torts rely on "but for" analysis); *see also KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 393 (Tex. App.—5th Dist. 2012, no pet.) (citing *Michiana*, 168 S.W.3d at 791) (contacts with the forum through telephone and email communications and sending of payments were insufficient evidence of purposeful availment); *accord. Saidara*, 633 S.W.3d at 131.

[¶ 64]   Here, Talati testified he never purposefully availed himself of Texas because he does not reside in Texas, did not travel to Texas during JT Capital's proposed joint venture with Blom, never visited the Property, nor directed the alleged misrepresentations to Texas.[49]

[¶ 65]   In response, Blom highlighted Talati's deposition where he acquiesced to likely having conversations with one of Blom's employees while the employee was in Texas.[50]   Even assuming Talati made the representations knowing the employee was in Texas is not enough to bestow jurisdiction.  *See Old Republic*, 549 S.W.3d at 561 ("Even assuming the phone calls were sufficiently connected to the claim, a proper minimum-contacts analysis looks to the defendant's contacts with the forum state, not the defendant's contacts with persons who reside there.").  Just like in *Old Republic* there is no evidence that Talati initiated the phone calls with Blom's employee and this court could just as easily infer that Talati accepted the phone calls.  *Id.*  Thus, the only connection between Texas and the alleged misrepresentations is they generally implicate Texas real property.

---

[49] Talati's Am. Blom SA, Ex. A, ¶s 4–12.
[50] App'x to Blom's Resp. at 049.

[¶ 66] Although a state is interested in exercising jurisdiction over those who commit torts within its territory, this interest "is insufficient to automatically exercise personal jurisdiction upon an allegation that a nonresident directed a tort from outside the forum." *Moncrief*, 414 S.W.3d at 152.

[¶ 67] Relying on *Tabacinic,* Blom nevertheless argues that this connection is sufficient to subject Talati to specific jurisdiction.[51]

[¶ 68] In *Tabacinic*, a Texas couple sued the sellers of their home alleging that the sellers misrepresented aspects concerning the home's construction and that there were no liens on the property. 372 S.W.3d at 664-67. The court agreed, specifically highlighting that the representations at issue necessarily had to occur in Texas and affected Texas property. *Id.* at 670. Furthermore, the nonresident defendants both owned the Texas property and signed the contracts in their personal capacities when the misrepresentations were made. Because of these facts, the court held that the sellers purposefully availed themselves of the forum. *Id.* at 670-71.

---

[51] *See* Blom's Resp. at 16 (citing *Tabacinic*, 372 S.W.3d at 670).

[¶ 69]  Here, while the alleged misrepresentations also implicated Texas real property, the alleged misrepresentations concerned either documentation (e.g., completing the private placement memorandum)—which could be completed anywhere—or future obligations (e.g., paying property taxes).  *Cf. id.* at 670 (sellers misrepresentations concerned ongoing construction work).  It is undisputed that JT Capital—or by extension, Talati—ever took possession of the Property, so any alleged misrepresentations affecting the Property were purely prospective and more attenuated than the circumstances in *Tabacinic. Cf. id.*

[¶ 70]  Accordingly, these alleged misrepresentations do not demonstrate that Talati purposefully availed himself of the forum.

### 5.  Lead Sponsor and Personal Guarantor

[¶ 71]  Blom and Capella further assert that Talati orally represented that he would serve as a personal guarantor of the loan and lead sponsor of the Property acquisition.[52]  As support, Blom provided a declaration from its CEO and emails from around that time.[53]  However, Talati testified that he never

---

[52] *See* Capella's SAAC ¶s 34–36.
[53] *See e.g.*, App'x to Blom's Resp. (Sebastien Declaration), ¶ 7; (Ex. A-3) at 021.

made such representations.[54]  So both sides have provided some evidence on this issue.  *See Kelly*, 301 S.W.3d at 659.

[¶ 72]  A trial court frequently must resolve fact questions before deciding a jurisdiction question.  *BMC*, 83 S.W.3d at 794.  But the court need not resolve this issue because the Texas Supreme Court broadly rejected the "direct a tort" jurisdictional theory and these contacts fall short of that court's standards.  *Moncrief*, 414 S.W.3d at 152.

[¶ 73]  Nonetheless, Blom and Capella cite *Retamco* to argue that Talati created "continuing relationships with and obligations to Texas" by saying that he would become the lead sponsor of the Property and personal guarantor of the loan and thus has sufficient minimum contacts with Texas.[55]  The court disagrees.

[¶ 74]  In *Retamco*, a Texas corporation sued a nonresident defendant corporation for violating the Texas Uniform Fraudulent Transfer Act as the transferee of Texas oil and gas interests.  278 S.W.3d at 335–36.  The defendant argued that Texas lacked personal jurisdiction because the alleged fraudulent assignments occurred entirely outside of Texas.  *Id.* at 337.  The

---

[54] Talati's Capella Reply, Ex. A at 215:24–216:25.
[55] Blom Resp. at 13; Capella's Resp. at 17.

Texas Supreme Court disagreed, concluding that by knowingly taking assignment of Texas *real property* the nonresident corporation reached out and created a continuing relationship in Texas, pursuant to its obligations and expenses related to those interests. *Id.* at 339.

[¶ 75] *Retamco* does not turn on allegedly tortious acts affecting Texas real property. *See Old Republic*, 549 S.W.3d at 564. Instead, *Retamco* turns on the fact that because the nonresident corporation acquired ownership of Texas real property it derived profit from Texas and thereby created a continuing connection with the state. *See id.* Since Talati never acquired ownership of the Property (and there are no allegations that he ever intended to *personally* acquire the property), he never personally enjoyed the "benefits and protections" of Texas law nor any of the "certain continuing obligations" that arise from real property ownership. *Cf. Retamco*, 278 S.W.3d at 339.

[¶ 76] Thus, *Retamco*'s reasoning and holding do not support specific jurisdiction over Talati. *See id.* 278 S.W.3d at 338–39.

### 6. Personal Benefit

[¶ 77] Blom and Capella further urge this court has jurisdiction over Talati because he sought to profit from the Project thereby availing himself of the forum. They specifically allege that JT Capital raised $4 million and Talati

defrauded the Project by keeping $500,000 as an "acquisition fee."[56] Talati disputed this allegation in his deposition claiming that neither he nor JT Capital received any acquisition fee.[57] Talati also asserted that even had he received the alleged fee, all alleged events regarding the fee happened in California, preventing Texas from imposing jurisdiction over him.[58] Capella and Blom presented no contravening evidence.

[¶ 78] Personal property (money) is treated differently than real property for jurisdictional purposes. *See Old Republic*, 549 S.W.3d at 563–64 (receiving money from Texas does not create the same continuous contacts that real property does); *Niehaus v. Cedar Bridge Inc.*, 208 S.W.3d 575, 582 (Tex. App.—3d Dist. 2006, no pet.) (receiving allegedly fraudulent bonuses at the expense of a Texas corporation insufficient to establish jurisdiction).

[¶ 79] Beyond the acquisition fee, which has no direct connection with Texas, Blom and Capella failed to allege or prove what Texas property Talati misappropriated or that a misappropriation occurred in Texas. *See Booth*, 485 S.W.3d at 486 (failure to allege what Texas property nonresident

---

[56] Blom's Resp. at 5; Capella's Resp. at 21.
[57] Talati's Capella Reply at 18–19.
[58] Talati's Capella Reply at 12.

defendant wrongfully controlled); *Niehaus*, 208 S.W.3d at 583 (no evidence linking the defendants' fraudulent activity to Texas).

[¶ 80] Thus, Blom and Capella seek to subject Talati to Texas jurisdiction because he *intended* to indirectly benefit from the planned joint venture's acquisition and ownership of the Property. This is too tenuous because

> [b]usiness contacts are generally a matter of physical fact, while tort liability (especially in misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter.

*Michiana*, 168 S.W.3d at 791.

### 7. Partnership

[¶ 81] Capella additionally asserts that jurisdiction over Talati exists because he partnered with Blom and Capella to purchase the note and Property. A partnership is defined as "an association of two or more persons to carry on a business for profit as owners." TEX. BUS. ORG. CODE § 152.051(b). When, as here, an express agreement does not exist, courts determine whether parties intended to form a partnership upon the totality of the circumstances. *Houle v. Casillas*, 594 S.W.3d 524, 547 (Tex. App.—8th Dist. 2019, no pet.).

[¶ 82]   Again, however, business contacts are a matter of physical fact and do not turn on what the parties thought, said, or intended.  *Michiana*, 168 S.W.3d at 791.  The argument that Capella, Blom, and Talati were partners is thus conclusory.  *Freyer v. Lyft, Inc.*, 639 S.W.3d 772, 790 (Tex. App.—5th Dist. 2021, no pet.) ("A conclusory statement is one that does not provide the underlying facts to support the conclusion.").

[¶ 83]   The court concludes that this conclusory allegation is insufficient to establish jurisdiction.  *PermiaCare v. L.R.H.*, 600 S.W.3d 431, 444 (Tex. App.—8th Dist. 2020, no pet.).

\* \* \* \* \*

[¶ 84]   Accordingly, none of the grounds argued by Blom or Capella support this court asserting personal jurisdiction over Talati.

## C.  Alter Ego Jurisdiction

[¶ 85]   Capella further asserted that Talati is subject to personal jurisdiction based on JT Capital's activities because it operates as his alter ego.  *See Tabacinic*, 372 S.W.3d at 669 ("Jurisdiction over an individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual.").  A plaintiff asserting an alter ego relationship to impute a corporation's contacts

with the forum to the individual must prove that alter ego relationship exists. *Atiq*, 2015 SW 6871219, at *8.

[¶ 86]  Here, Capella generally alleges that Talati is controlling JT Capital's internal business operations and affairs to such a degree that JT Capital functions as his mere instrumentality.[59]  Capella specifically alleges that Talati used JT Capital as a conduit to perpetuate actual fraud for his direct personal benefit.[60]  However, Capella fails to provide any of the underlying facts supporting these allegations.  *Freyer*, 639 S.W.3d at 790.

[¶ 87]  First, there are no indications that Talati disregarded JT Capital's corporate formalities.  Talati has a sizeable interest in JT Capital but he neither wholly nor directly owns it.[61]  JT Capital is instead equally owned by an unrelated entity and MT Capital LLC, which Talati owns.[62]  Common ownership—even when combined with common corporate officers—is insufficient to demonstrate that JT Capital is Talati's alter ego.  *PHC-Minden*, 235 S.W.3d at 175.  Instead, there must be some level of control that is "abnormal."  *Id.* at 176; *BMC*, 83 S.W.3d at 800.

---

[59] Capella's SAAC ¶ 69.
[60] Capella's SAAC ¶s 29, 70.
[61] Talati's Capella Reply at App. 011–12.
[62] Talati's Capella Reply at App. 011–12.

[¶ 88]  Second, there is no evidence that Talati exerted control beyond that of a typical shareholder and corporate officer. *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975) (subsidiary not a parent's alter ego merely because of stock ownership, a duplication of some directors and officers, or an exercise of control stock ownership gives to stockholders). Talati was involved in the process of acquiring and investing in the Property in his role overseeing JT Capital's strategic investment decisions.[63]  However, there is no evidence that Talati ever exercised abnormal control over JT Capital or held JT Capital out as his mere instrumentality.  Instead, all negotiations and agreements in pursuit of acquiring the Property were between Blom, Capella, and JT Capital—not Talati.

[¶ 89]  Accordingly, the court concludes Capella's alter ego argument is conclusory. *PermiaCare*, 600 S.W.3d at 444.

## IV.  CONCLUSION

[¶ 90]  For these reasons, the court granted Talati's special appearances on October 16, 2025.

---

[63] App'x to Blom's Resp. at 034.

So ORDERED.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  October 29, 2025

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 107438669
Filing Code Description: No Fee Documents
Filing Description: Memorandum Opinion
Status as of 10/29/2025 2:55 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Aubry Dameron | | aubry@springer-lyle.com | 10/29/2025 2:29:50 PM | SENT |
| Brent A.Turman | | bturman@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Tonya C.Stephenson | | tstephenson@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Kartik R.Singapura | | ksingapura@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Catherine E.Helm | | chelm@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Danyelle Stone | | dstone@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Records Department | | Records@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Chinar Hassan | | chinar.hassan@wickphillips.com | 10/29/2025 2:29:50 PM | SENT |
| Nathan Cox | | ncox@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Nathan Cox | | ncox@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Stephanie Loccisano | | stephanie@springer-lyle.com | 10/29/2025 2:29:50 PM | SENT |
| Darby Dean | | darby@springer-lyle.com | 10/29/2025 2:29:50 PM | SENT |
| Alex Hamel | | ahamel@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Alex Hamel | | ahamel@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| Ashley A.Hutcheson | | ashley.hutcheson@wickphillips.com | 10/29/2025 2:29:50 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 10/29/2025 2:29:50 PM | SENT |
| Liz Duenas | | lduenas@bellnunnally.com | 10/29/2025 2:29:50 PM | SENT |
| L. DavidAnderson | | david.anderson@wickphillips.com | 10/29/2025 2:29:50 PM | SENT |
| Camille L.Youngblood | | camille.youngblood@wickphillips.com | 10/29/2025 2:29:50 PM | SENT |
| Toni Thompson | | toni.thompson@wickphillips.com | 10/29/2025 2:29:50 PM | SENT |
| Barb Morgan | | barb.morgan@wickphillips.com | 10/29/2025 2:29:50 PM | SENT |